# SUPREME COURT OF WISCONSIN

| | |
|---|---|
| CASE NO.: | 2015AP202-CR |
| COMPLETE TITLE: | State of Wisconsin, <br>      Plaintiff-Respondent-Petitioner, <br>   v. <br> Jeffrey C. Denny, <br>      Defendant-Appellant. |

REVIEW OF A DECISION OF THE COURT OF APPEALS

| | |
|---|---|
| OPINION FILED: | February 28, 2017 |
| SUBMITTED ON BRIEFS: | |
| ORAL ARGUMENT: | October 26, 2016 |

| | |
|---|---|
| SOURCE OF APPEAL: | |
|   COURT: | Circuit |
|   COUNTY: | Ozaukee |
|   JUDGE: | Joseph W. Voiland |

| | |
|---|---|
| JUSTICES: | |
|   CONCURRED: | |
|   CONCURRED/DISSENTED: | ROGGENSACK, C.J. concur and dissent (opinion filed). |
|   DISSENTED: | ABRAHAMSON, J., dissents (Opinion filed). <br> BRADLEY, A. W. J. dissents, joined by ABRAHAMSON, J. (Opinion filed). |
|   NOT PARTICIPATING: | |

ATTORNEYS:

For the plaintiff-respondent-petitioner the cause was argued by *Misha Tseytlin*, solicitor general, with whom on the brief was *Daniel P Lennington*, deputy solicitor general, *Donald V. Latorraca,* assistant attorney general, and *Brad D. Schimel* attorney general.

For the defendant-appellant, there was a brief and oral argument by *Keith A. Findley*, and Wisconsin Innocence Project, with whom on the brief was *Steven D. Gunder*, assistant state public defender.

No.  2015AP202-CR
(L.C. No.  1982CF425)

STATE OF WISCONSIN          :         IN SUPREME COURT

**State of Wisconsin,**

      **Plaintiff-Respondent-Petitioner,**

  **v.**

**Jeffrey C. Denny,**

      **Defendant-Appellant.**

NOTICE

**This opinion is subject to further editing and modification. The final version will appear in the bound volume of the official reports.**

**FILED**

**FEB 28, 2017**

Diane M. Fremgen
Clerk of Supreme Court

REVIEW of a decision of the Court of Appeals.  *Reversed.*


¶1  ANNETTE KINGSLAND ZIEGLER, J.   This is a review of a published decision of the court of appeals, State v. Denny, 2016 WI App 27, 368 Wis. 2d 363, 878 N.W.2d 679, which reversed the Ozaukee County circuit court's[1] order denying Jeffrey C. Denny's ("Denny") postconviction motion for forensic deoxyribonucleic acid ("DNA") testing of evidence pursuant to Wis. Stat. § 974.07 (2013-14)[2] and remanded the case for forensic DNA testing at private or public expense.  Denny, 368 Wis. 2d 363, ¶¶1, 64.

---

[1] The Honorable Joseph W. Voiland presided.

[2] All subsequent references to the Wisconsin Statutes are to the 2013-14 version unless otherwise indicated.

¶2 On November 15, 1982, a jury found Denny and his brother Kent guilty of the murder of Christopher Mohr ("Mohr"). Denny was sentenced to life imprisonment. Over three decades later, in 2014, Denny filed a motion claiming innocence and requesting forensic DNA testing of evidence taken from the scene of Mohr's murder. Denny asked the circuit court to order that the testing occur at public expense, or, in the alternative, at Denny's own expense.

¶3 Whether, and the conditions under which, a court will order such postconviction forensic DNA testing are questions governed by Wis. Stat. § 974.07 ("Motion for postconviction deoxyribonucleic acid testing of certain evidence."). Interpreting this statute, the circuit court below concluded that Denny was not entitled to testing either at public or at private expense. The court of appeals disagreed. We are asked to determine whether Denny has met the statutory requirements for forensic DNA testing of the evidence he has identified.

¶4 We conclude that the circuit court did not err in denying Denny's postconviction motion for forensic DNA testing of certain evidence. Consequently, we reverse the decision of the court of appeals.

I. FACTUAL AND PROCEDURAL BACKGROUND

¶5 On January 26, 1982, police discovered Mohr's body in a room on the second floor of a house in Grafton, Wisconsin. On June 25, 1982, a criminal complaint was filed against Denny in Ozaukee County circuit court charging him as party to the crime of the first-degree murder of Mohr, contrary to Wis. Stat.

2

§ 940.01 (1981-82) and Wis. Stat. § 939.05 (1981-82). Denny's brother Kent was also charged.

¶6 From November 9 to November 15, 1982, Denny and Kent were tried jointly before a jury.[3] At trial, the State presented its case against Denny and Kent in the following general[4] manner.

¶7 Jonathan Leatherman ("Leatherman") testified that on January 26, 1982, at around 9:30 a.m., he spoke to Mohr on the phone about traveling to Mohr's house to smoke marijuana. Around 10:45 or 10:50 a.m., Leatherman began walking to Mohr's house, arriving there minutes later. Leatherman entered the house, went upstairs, and upon opening the door to "[Mohr's] room" saw Mohr's body on the floor. Leatherman called the "rescue squad" and reported a suicide. He then returned to Mohr's room to retrieve a quarter pound of marijuana which he suspected was in Mohr's room in order to "save [Mohr] from

---

[3] The Honorable Warren A. Grady presided.

[4] We provide the following account of the trial proceedings because, as will become apparent, these details are relevant to our evaluation of whether, in the words of the postconviction forensic DNA testing statute, "[i]t is reasonably probable that [Denny] would not have been prosecuted . . . [or] convicted" of his crime "if exculpatory [DNA] testing results had been available before the prosecution . . . [or] conviction." Wis. Stat. § 974.07(7)(a)2.

This summary is not intended to provide a comprehensive discussion of the testimony given at Denny's jury trial or of the cross-examination of the witnesses discussed. The witnesses are not presented in this section in the exact order in which they testified at trial.

trouble," but ultimately went outside to wait for the police empty-handed.

¶8  Later that day, Leatherman received a call from Kent. When asked when he had last spoken to Kent prior to that call, Leatherman replied, "I'm not sure, maybe a week, I'm not sure, maybe more."  Kent asked Leatherman if he "knew to [sic] get any pot" and after Leatherman said he did not, Kent "said what about [Mohr]," and Leatherman informed Kent that Mohr had killed himself.  Kent asked Leatherman if he wanted to "stop over" later that day, and Leatherman did so.  At Kent's house, Leatherman had a conversation with Kent and Denny about Leatherman's experiences that day.

¶9  Gary Helm ("Helm") testified that he worked for the Grafton Street Department and was also part of the Grafton rescue squad.  On January 26, 1982, at around 10:55 a.m. to 11:00 a.m., Helm was "picking up garbage" as part of his employment when he received notification of an attempted suicide.  Helm traveled to the reported address where he met a police officer outside of Mohr's house.  There, "a fella in front of the house . . . was yelling help him, please help him, I don't believe he did it."  According to Helm's testimony, Helm and the officer went inside and up to Mohr's room.  Helm tried but failed to obtain a pulse reading.

¶10 Daniel Palkovic ("Officer Palkovic") of the Grafton Police Department testified that he was dispatched to Mohr's residence on January 26, 1982, and that he accompanied Helm to Mohr's room.  Officer Palkovic described a number of items

4

retrieved from the scene of Mohr's murder, from areas nearby, or from Mohr's body at the autopsy. These items were introduced as exhibits at trial and included: (1) a jacket found in Mohr's room which appeared to have blood on it; (2) a torn shirt removed from Mohr which had blood on it; (3) jeans removed from Mohr which had blood on them; (4) socks removed from Mohr which had blood on them; (5) "under briefs" removed from Mohr which had blood on them; (6) a hat found in Mohr's room which had blood on it; (7) gloves found in Mohr's room; (8) a yellow towel taken from the hallway directly outside of Mohr's room which had blood on it; (9) samples of Mohr's head and pubic hair; (10) hair that had been "clenched in . . . Mohr's left hand"; (11) hair located between the fingers of Mohr's right hand, which was "closed somewhat, but . . . not fully clenched"; (12) hair stuck to Mohr's chin and neck by dried blood; (13) loose hair "taken from [Mohr's] mouth area" which "[a]ppeared to be" "stuck" there by "a combination of dried blood and possibly saliva"; (14) hair at least apparently stuck to Mohr's pants by dried blood; (15) hair, "a possible seed of some type," and some glass fragments stuck to Mohr's skin and shirt in his "upper chest area"; (16) the "top or main portion of a bong pipe" found in Mohr's room which "appear[ed] to have been shattered or broken on one end" and which appeared to have blood on its "tube"; (17) the "base portion" of the bong pipe, which was found in Mohr's room; (18) the "bowl portion" of the bong pipe, which was found in Mohr's room and which had blood on it; (19) "fragments of . . . maroon plexiglass material, similar to the top portion of the bong

pipe," found "scattered about" Mohr's room in "[r]oughly the immediate area of [Mohr's] body itself" and which had blood on them; (20) "pieces of the maroon plexiglass portion of the bong pipe and . . . a metallic[-]type of rod which was found to be located on the floor under [Mohr] after his body was moved" which had blood on them; (21) a "rubber-type of grommet" used with the bong pipe and found "just inside of the doorway leading into" Mohr's room; (22) a "glass drinking container" which was found on the floor next to an ice cube, had blood on it, and had "a small amount of orange liquid at the bottom of the glass"; (23) ice cubes (by the time of trial, water) collected from various areas of Mohr's room and observed around 11:30 a.m.; and (24) a phone directory found in the hallway on the second floor of Mohr's house with a "footwear impression on the cover" which appeared to be caused at least in part by blood. On cross-examination, Officer Palkovic conceded that the "shoe bottom pattern" imprinted on the phone book was a common one.

¶11 There were additional items discussed during Officer Palkovic's testimony which were not, ultimately, received by the court: (1) a yellow stool which was taken from a room of Mohr's house different from the room Mohr was found in and which appeared to have blood on it; (2) a "small water faucet-type screen" stuck to Mohr's shirt by dried blood, similar to other screens found in Mohr's room; (3) "several screens, safety pins and some screws and some thumb tacks" which "gave the appearance, were attached to the back of the victim's neck and head area, the hair area itself" by "blood which had

coagulated"; (4) certain "fragments or pieces of the plexiglass portion of the bong pipe" found "on the floor of . . . [Mohr's] bedroom alongside" Mohr's body; (5) scissors found in Mohr's room; (6) a red disposable lighter found in Mohr's room under Mohr's right shoulder which appeared to have blood on it; and (7) blood samples removed from an overturned "metal lawn chair" found in Mohr's room.

¶12 Samples of the defendants' head and pubic hair taken directly from the defendants were also introduced.

¶13 Ozaukee County Deputy Coroner Ruth Heiser testified that on January 26, 1982, she was dispatched to Mohr's house and that she pronounced Mohr dead at 12:05 p.m. that day.

¶14 Dr. Hellen Young ("Dr. Young"), who performed an autopsy of Mohr, discussed the nature and extent of the wounds on Mohr's body and her opinion of the cause of Mohr's death. According to Dr. Young, Mohr's death was caused by "massive hemorrhage due to multiple incised wounds." Dr. Young described over 50 wounds on Mohr's body and opined that at least some of these wounds were caused by a knife. One wound in particular was a "good-sized gaping wound" in Mohr's "back directly over the area of where the heart would be reflected" requiring "at least two to three" "gashes." Mohr's heart, however, was "intact within [his] body." Mohr had a "large gaping wound" on his throat. He had two wounds in his stomach "made by one stab wound" which Mohr would have sustained "early in the series of wounds that were received." Dr. Young further discussed injuries to Mohr's head caused by "blunt trauma" and agreed that

7

at least a portion of the bong pipe introduced into evidence could have produced such injuries.

¶15 The "meat and potatoes of the case," in the State's words, were the collection of witnesses called by the State who testified as to numerous statements made by Denny and Kent about Mohr's murder.

¶16 Trent Denny ("Trent"), Denny and Kent's brother, testified that "two, three days" after Trent was released from the Ozaukee County Jail on February 21, 1982, Kent told Trent that Kent had killed Mohr. On a separate occasion ("I think it was the day after I talked to Kent," according to Trent), Trent asked Kent "if he really did it," and Kent replied "yes." Two or three days after that, Trent asked Denny "if it was true." Denny "asked [Trent] why did Kent tell[?]" After Trent told Denny that "Kent told [Trent] he killed" Mohr, Denny "looked at [Trent] like he was mad." Trent offered his assistance to Denny. Denny told Trent that Denny and Kent had stabbed Mohr. Specifically, Kent asked Mohr "how he felt," then stabbed Mohr once in the stomach, then asked Mohr "how he felt now," then gave the knife to Denny, after which Denny stabbed Mohr. Mohr "was coming after [Denny] while [Denny] was stabbing him." Kent "hit [Mohr] over the head with the bong." On yet another occasion, Trent again asked Kent "if it was true," and Kent affirmed that it was.

¶17 "Maybe two, three" weeks after Trent spoke with Denny, Trent had a conversation with Kent and Denny. They told Trent "we had to get rid of the clothes." That night, Kent, Trent,

8

and Lori Jacque ("Jacque") drove to a cemetery. Kent got out of the car and went to the cemetery. Five minutes later, he returned carrying a paper bag and the three drove away. Kent "said something that there was blood on the clothes," and "asked [Trent and Jacque] if [they] could smell it." At some point while in the car that night, Kent pulled a shirt out of the bag and Trent saw a "stain" on it. On cross-examination, Trent agreed that he did not "really know what was in [the] bag," and instead "just assumed it was the clothes." Eventually the three drove to Jacque's house, Jacque retrieved a plastic bag, and Kent put the paper bag into the plastic bag. The three then drove to a dump in either "Port or Fredonia," and Kent "shot the bag into the dump."

¶18 On another date, behind Trent's house, Denny showed Trent what Denny said was a knife. Trent saw the handle, but not the blade. Finally, a separate time Trent asked Kent and Denny together "if they did it," and "[t]hey told [Trent] yes."

¶19 Jacque testified that on February 20, 1982, while at a party in "the Denny room" (referred to later as Kent's bedroom), Kent "looked very upset" and told Jacque that he had killed Mohr. Later that night, Kent indicated to Jacque that "[h]e wanted to go get the clothing back from the graveyard." "About a week after that," Kent again spoke with Jacque about the clothing. A "couple weeks after" the initial conversation, according to Jacque, Jacque, Trent, and Kent drove to a "graveyard." Kent exited the car and came back "with a bundle of clothes under his arm." Back in the car, Kent held up a

9

shirt. The three stopped at Jacque's house, where they retrieved a paper bag. They then drove to the town dump in the "Town of Port." Kent had placed the clothing in the bag. He exited the car and walked to the dump. Jacque and Trent "drove down the road and turned around and came back and picked him up." That night, Kent said that he was "glad to get rid of the clothes."

¶20 On another date, Jacque was in a car with Kent and Denny. She heard Kent and Denny have a conversation about how "they forgot the tennis shoes." On another date, "Kent had said that he wanted to turn himself in" because "[i]t was just getting to be too much." Kent was crying at the time. On another date, in Kent's room, Denny "said something about a scratch on his leg," namely "[t]hat that was from where [Mohr] had scratched him." Jacque did not actually see any scratches. Finally, when asked "Were there any other conversations that you remember?" Jacque replied, "Well, several times there was things said about it." However, Jacque did not "remember any of those in any specifics besides what [she had] already stated."

¶21 On cross-examination, Jacque testified that on separate occasions Kent had told her, with regard to the reason for Mohr's murder, that "somebody put a gun to his head" and that "he did it to prove it to his brother." Jacque was also asked "on another occasion did he do it to say it was because it was either him or [Mohr]?", and she replied "Yes, I think I heard something like that done."

¶22 Diane Hansen ("Hansen") testified that "approximately a week after" Mohr's death, at the Sundance Tavern, Kent told Hansen that "he killed [Mohr]," and then, after Hansen started crying, that "he was only kidding." On cross-examination Hansen agreed that Kent also said "do you think I'd do something like that?" A "[c]ouple weeks later," Kent told Hansen that he went to Mohr's house, that Mohr was "standin' by the fish tank and [Kent] stabbed" Mohr in the stomach, then left the room and "[g]ot sick."

¶23 "[A] long time after that," Hansen asked Kent "if there was any truth to the rumor that [Mohr's] heart was cut out," and Kent told Hansen "[y]es." Hansen also testified, in response to the question of whether Kent had, at any time, told Hansen "that he saw anyone walking up the street as he got out of [Mohr's] house," that "[Kent] said he thought he saw . . . Leatherman," specifically "[o]n a road behind a garbage truck." On cross-examination, Hansen testified that in her "very first" conversation with Kent about Mohr's death, Kent told Hansen that Leatherman "had found [Mohr] and [Mohr] was dead," and that "it was an accidental death." On re-direct, Hansen explained that the conversation was the "same day" as Mohr's death.

¶24 Lori Ann Jastor Commons ("Commons") testified that, while at a party at Kent's house the night before Trent "got out of jail," she heard Kent say:

> [Mohr] was at his fish tank and Kent went up to him and stabbed him and asked him how he felt,

11

and . . . [Mohr] replied that he felt all right and that he proceeded to stab him one more time and he had gotten sick and run into the bathroom and [Denny] had taken over.

At that point Denny "just stabbed him." Commons clarified that Kent told Commons that he stabbed Mohr "[i]n his side."

¶25 Commons also discussed a conversation she heard that occurred "approximately three weeks after the murder" at the "Sundance Bar in Port":

> [Kent] was talking to a friend of mine, . . . Hansen, when I came out of the bathroom, and [Hansen] was crying and I went up to her to see what was wrong and Kent was talking to her and said that he had to do it, otherwise it would have been him.

¶26 Robin Doyle ("Doyle") testified that she asked Kent "how, out of curiosity if he had killed" Mohr. Kent said "[y]es he did." Kent also told Doyle that "he had told everybody, that he ever told, something different so that the stories wouldn't match up."

¶27 Kent's coworker, Carl Winker ("Winker"), testified that at the end of April 1982 Kent told him that he "knew the guy" who killed, in the words of the State, "a boy in Grafton." Kent told Winker that "the guy started stabbin' him and he just kept doin' it," that "the guy" "liked it, got into it," and that "the guy's heart was cut out." Kent also told Winker that the killing "was for drug money." Some time later, Kent told Winker that he would not be coming to work anymore. When asked why, Kent stated it was because he was going to jail. When asked why he was going to jail, Kent said "because of that guy that got

12

killed." Winker asked Kent, "[W]hy, do you know something about it?" Kent replied, "[N]o, I'm the guy that did it." On another occasion, Kent told Winker "there was a coat and a knife and a dump in Sheboygan and the coat was full of blood."

¶28 Steven Hansen ("Steve H.") testified that in early March 1982 Denny told Steve H. that "[Denny] and Kent had killed" Mohr. Denny told Steve H. that Denny and Kent went to Mohr's bedroom, that Kent "pulled out a knife and . . . proceeded to stab" Mohr. Steve H. also testified that he remembered telling Officer Palkovic that Denny told Steve H. the following:

> Mohr was facing the window when the Denny boys were in the bedroom and Kent pulled a knife out and looked at [Mohr], and looked at . . . Denny and then . . . Denny nodded his head and Kent started stabbing [Mohr] in the stomach[.]
>
> . . .
>
> Mohr would not fall, but subsequently he did fall to the floor and . . . [Denny] kicked . . . Mohr[.]
>
> . . .
>
> [Denny] and Kent . . . walked out of the house and they didn't think anyone saw them[.]
>
> . . .
>
> [Either Kent or Denny told Steve H. that] Kent and [Denny] might have seen . . . Leatherman when they

were leaving the . . . Mohr residence the day of the murder[.][5]

¶29 Patricia Robran ("Robran") testified that in either March or April 1982 she was present in the basement of her parents' house with Denny. Denny was crying. Eventually Denny told Robran "that him and . . . Kent were the ones who killed that one boy in Grafton," that "him and Kent stabbed him and they hit him" with a bong, that "there was no reason for it and alls I got was a quarter pound [of marijuana] out of it." Denny informed Robran that "Kent stabbed [Mohr] first and he handed [Denny] the knife and Kent told him to continue what he was doing until he got back, so [Denny] did, and he didn't remember if he did it five or ten or fifteen times." Robran added that Denny told her that before the stabbing occurred, "Kent had asked [Mohr] how he was feeling, he said he was feeling fine, and then Kent stabbed him and asked him how he'd feel now. They just kept doin' it."

¶30 Daniel Johansen ("Johansen"), an inmate at the Ozaukee County Jail, testified that Denny told him about Mohr's murder. Johansen stated that Denny told him:

> [Denny] and Kent went over to . . . Mohr's house, and I'm not sure, but it was either the, that [Mohr] owed Kent money or they were going to pick up some pot, and [Denny] . . . went out of the room and that [Mohr] and Kent were in and he said all of a sudden he heard how

---

[5] These statements were read to Steve H. by the State, and Steve H. simply assented to having told them to Officer Palkovic. On cross-examination, Steve H. agreed that he did not "really remember how these statements which [the State] ha[d] read to [him] got to Officer Palkovic or into his report."

14

does this feel, and he came back in the room and Kent
had stabbed him in the stomach.

. . .

[T]hen he said that Kent just started stabbing him and
then he went to the bathroom and looked in the mirror
at himself because he couldn't believe it.

. . .

[Denny] . . . hit [Mohr] over the head with a bong and
kicked him a couple times.

. . .

[Denny] said the shoes he, he took 'em over to some
sewage plant in here, in Port or some sewage plant
around here.

. . .

[H]e . . . threw 'them in.

¶31 Tod Trierweiler ("Trierweiler") testified that in late
March of 1982 he was in the Denny house with Russ Schram
("Schram"), Tammy Whitaker ("Whitaker"), Kent, and Denny.
Trierweiler left with Denny in a car.[6] They stopped at a gas
station in Grafton. Denny asked for and obtained the keys to
Trierweiler's car and put a brown bag "rolled about half-way"
into the trunk of the car. Trierweiler drove Denny to the
Sundance Tavern, then went to his girlfriend Cindy Otto's
("Otto") house, where he told Otto "about the keys." Later,
Trierweiler found a bag that "looked like it was half-way down
and it was rolled up" in his car and opened it. Inside were a

---

[6] It is unclear from the testimony whether, in Trierweiler's
account, other individuals accompanied the two.

pair of tennis shoes and a pair of brown loafers. Trierweiler wore the tennis shoes for about three months. As to the loafers, Trierweiler testified, "[M]y girlfriend's brother came up from Texas with no pairs of shoes . . . and I guess he took 'em." Eventually Trierweiler gave the tennis shoes to Sergeant Fred Goetz ("Sergeant Goetz"), who was "looking for the shoes." Trierweiler stated on cross-examination that when he retrieved the tennis shoes from his car he examined them and there was no blood on them. For his part, Sergeant Goetz testified as to receiving the shoes from Trierweiler, and as to the chain of custody following his receipt of the shoes. Sergeant Goetz agreed that Trierweiler had told him that "he could not state for certain if [the shoes] were the ones that . . . Denny had placed in his trunk." These shoes were admitted into evidence.

¶32 Otto testified that she and Trierweiler had a conversation about the keys, that she and Trierweiler discovered a "brown grocery bag" which contained two pairs of shoes in the trunk of Trierweiler's car, that Trierweiler wore the tennis shoes, and that her brother took the second pair of shoes, which she described as "suede tied shoes." Otto also discussed an occasion when Denny asked Trierweiler "if he could go back to look at [Trierweiler's] house to look in or at [Trierweiler's] car." Trierweiler refused at the time because he was late to drop Otto off at home. Otto also discussed how Trierweiler came to give the tennis shoes to Sergeant Goetz.

¶33 Whitaker testified that she was at a party in late March 1982 with Kent, Denny, Schram and Trierweiler at the Denny

16

house. At one point Schram, Trierweiler, and Whitaker went outside. Schram "put the shoes in, on the bag, I should say, into the back seat [sic]" of a car and told Whitaker "those were the murder shoes." Denny then exited the house and the four went to a gas station. At the gas station, Schram and Denny "put the bag in the trunk." Whitaker described the bag as a "rolled," "brown paper bag."

¶34 Whitaker further explained that she was Denny's girlfriend of about eight months and testified to two accounts of Mohr's murder Denny had related to her, though she prefaced her testimony with the statement that her account was "a rough estimate of what [she] remember[ed]." First, Denny told Whitaker "[t]hat . . . Leatherman and [Denny] went over to . . . Mohr's house and [Leatherman] got in a fight with [Mohr] and started stabbing him, and then . . . [Leatherman] asked [Denny] to help 'im so [Denny] hit him." Second, Denny told Whitaker "[t]hat him and Kent went over to . . . Mohr's house and then they went up there . . . [and] Kent started stabbin' him and then [Denny] went into the bathroom, looked in the mirror and said my God, what'd I get myself into." Denny also told Whitaker that "they got" a quarter pound of "[p]ot" out of the murder.

¶35 Schram testified to events that occurred at a party in late March of 1982 at the Denny house. Schram, Trierweiler, Whitaker, Kent, and Denny were at the party. Schram stated, "We were gonna leave" and that Denny "took a bag out of the closet and took it with us." Schram described the bag as a "[r]egular

17

brown paper bag." Denny put the bag in the back seat of a car. At some time before Denny placed the bag in the car, he told Schram that the bag contained "[m]urder shoes." Schram testified that although he did not "exactly" remember who brought the shoes out to the car, he was "pretty sure it was" Denny. Schram continued that he and at least some of the others drove to a gas station, where Denny asked Trierweiler for the keys to the trunk of his car. Trierweiler gave Denny the keys and Denny "put the bag in there." The bag was "rolled up so you could carry it with a handle like." The parties eventually "dropped [Denny] off at a bar." Afterwards, Denny contacted Schram a "couple times, saying to get it out of the car." Schram told Denny that "he knew where [Trierweiler] lived and that he could get it from him anytime."

¶36 On another occasion, Schram, Kent, Denny, Whitaker, and Jacque were together in Grafton. Denny told Schram, "you'd be surprised how long it took a person to die." Another time "between March and April," according to Schram, Denny "was mad at Trent and . . . said that he'd take him out and put an arrow through him" because of "something about testifying." Additionally, on September 1, Schram received a call from Denny "from jail." Denny told Schram "[t]o not say anything about the shoes because [Schram would] be an accessory" to "[m]urder."

¶37 The State called Jeffrey Nilsson ("Nilsson"), who previously worked for the Wisconsin State Crime Laboratory and who analyzed blood and hair from the crime scene. Certain of the blood tested came from an individual of the same

18

international blood group to which Mohr belonged.  Other testing produced inconclusive results or was not possible.  Nilsson also examined "over two hundred hairs" and only two were inconsistent with the samples taken from Mohr when analyzed by "microscopic comparison."  These two hairs were also not consistent with samples taken from Denny and Kent.  The hairs were retrieved from a sterile sheet used to wrap Mohr's body and from Mohr's shirt.  These hairs were admitted into evidence.

¶38  Arthur Varriale of the State Crime Lab testified that he examined the phone book found in Mohr's house and "was able to detect the presence of human blood stains upon" the book.  He was not able to detect any blood on the shoes allegedly worn by Trierweiler.  Charles Hannah ("Hannah") of the State Crime Lab, who compared the tread on one of the shoes allegedly recovered from Trierweiler to the impression on the phone book, also testified.  Hannah explained that while the pattern on the bottom of the shoe was the same pattern as the incomplete impression on the phone book, he could not determine whether the shoe in fact made the impression.

¶39 Neither Kent nor Denny testified at trial.  Denny's attorney did not call any witnesses to testify.  Kent's attorney attempted to call several witnesses, but ultimately obtained meaningful testimony from only one: Gordon Denny ("Gordon"), the father of Kent, Trent, and Denny.  Gordon testified that his sons had been competing with each other "all their lives"; that Trent and Kent had a poor relationship; that Kent was sometimes

a practical joker, with some jokes being "quite elaborate"; and that Kent had "a habit of fabulation" or of "tell[ing] stories."

¶40 During closing arguments, the State pointed to, inter alia, the dozens of inculpatory statements allegedly made by Kent and Denny to various of the witnesses who had testified, the evidence relating to the alleged destruction of clothing, the episode in which Denny allegedly showed Trent the knife, and the evidence relating to the shoes allegedly worn by Trierweiler, including Hannah's opinion as to the similarity between the impression on the phone book and the pattern on one of those shoes. The attorneys for Kent and Denny, in turn, attacked the State's witnesses and the State's physical evidence on numerous grounds, arguing that the State had not met its burden of proving their clients guilty beyond a reasonable doubt. To take one example, Denny's attorney characterized some of the State's evidence as consisting of:

> [S]tatements which in my view have been made by unreliable, incredible braggarts, liars, to equal[ly] unreliable persons, who in my view, are drug users, possibly alcoholics, certainly drunkards, people who, themselves admitted on that witness stand to being people who exaggerate, who lie, who make up stories, who had faulty memories, who had to have their recollections refreshed by police.

¶41 According to the record, on November 15, 1982, the jury departed the courtroom to deliberate at 4:56 p.m. At 10:49 p.m. the court reconvened and the jury's verdict was read. The jury found Denny (and Kent) guilty of first-degree murder.

20

On November 16, 1982, the circuit court sentenced Denny to life imprisonment and a judgment of conviction was filed.

¶42 On April 14, 1983, Denny filed a motion for postconviction relief. On July 1, 1983, an order was filed denying that motion. On July 8, 1983, Denny filed a notice of appeal. On December 5, 1984, the court of appeals affirmed Denny's conviction. State v. Denny, No. 1983AP1311-CR, unpublished slip op. (Wis. Ct. App. Dec. 5, 1984). On February 5, 1985, this court denied review of that appeal.

¶43 Since that time, Denny has unsuccessfully attempted to upset his conviction on a number of occasions. See Denny v. Gudmanson, 252 F.3d 896, 898-99 (7th Cir. 2001).

¶44 On May 1, 2014, Denny filed a motion for postconviction forensic DNA testing under Wis. Stat. § 974.07. On August 4, 2014, he supplemented the motion.[7] Denny claimed he was innocent and sought to prove his innocence through forensic DNA testing of various items of evidence related to Mohr's murder and comparison of "any genetic profile found on the evidence with the DNA profiles of offenders in" state and federal DNA databanks. The items Denny sought to test included: (1) pieces of the bong pipe; (2) hair found on different areas of Mohr's body and on the sterile sheet used to wrap Mohr's body; (3) the yellow towel; (4) blood removed from the metal chair; (5) articles of Mohr's clothing; (6) the hat; (7) the

---

[7] There appear to be related filings in the record, but Denny directs us to these two.

gloves; (8) the lighter; (9) the screens; (10) the glass cup; (11) "facial breathing masks found at the scene," "one of which appeared to be quite heavily soiled," according to a supplemental report of the Grafton Police Department authored by Officer Palkovic; and (12) Mohr's hair. Denny theorized that the perpetrator's DNA was left at the crime scene, and that testing could produce several types of results supportive of Denny's claim: (1) "testing on many or most of the items [could] exclude[] [Denny]"; (2) "the same unknown third-party profile [could be] found on multiple items"; and (3) "DNA results on one or more items could exclude [Denny] and match a convicted offender in the state or federal databank." Denny claimed he was entitled to forensic DNA testing at public expense, or, in the alternative, at his own expense.

¶45 On January 2, 2015, the circuit court denied Denny's motion. On January 22, 2015, Denny filed a notice of appeal. On March 23, 2016, the court of appeals reversed the circuit court's order denying Denny's motion and remanded the case for forensic DNA testing at private or public expense. Denny, 368 Wis. 2d 363, ¶¶1, 64. The court of appeals concluded that Denny's motion met the pertinent requirements of Wis. Stat. § 974.07. See id.[8] On April 21, 2016, the State filed a

---

[8] Judge Hagedorn concurred in part and dissented in part, concluding that while Denny was entitled to testing at private expense, the circuit court's determination regarding testing at public expense should not be disturbed. State v. Denny, 2016 WI App 27, ¶89, 368 Wis. 2d 363, 878 N.W.2d 679 (Hagedorn, J., concurring in part and dissenting in part).

petition for review in this court. On June 15, 2016, this court granted the petition.

## II. STANDARD OF REVIEW

¶46 In this case we interpret and apply Wis. Stat. § 974.07. "The interpretation and application of a statute present questions of law that this court reviews de novo while benefitting from the analyses of the court of appeals and circuit court." State v. Alger, 2015 WI 3, ¶21, 360 Wis. 2d 193, 858 N.W.2d 346 (citing State v. Ziegler, 2012 WI 73, ¶37, 342 Wis. 2d 256, 816 N.W.2d 238).

> [W]e have repeatedly held that statutory interpretation "begins with the language of the statute. If the meaning of the statute is plain, we ordinarily stop the inquiry." Statutory language is given its common, ordinary, and accepted meaning, except that technical or specially-defined words or phrases are given their technical or special definitional meaning.

State ex rel. Kalal v. Circuit Court for Dane Cty., 2004 WI 58, ¶45, 271 Wis. 2d 633, 681 N.W.2d 110 (citations omitted) (quoting Seider v. O'Connell, 2000 WI 76, ¶43, 236 Wis. 2d 211, 612 N.W.2d 659). The standard of review applicable to the circuit court's denial of Denny's motion will be discussed below.

## III. ANALYSIS

¶47 Our analysis proceeds in three basic parts. First, we provide an overview of the postconviction forensic DNA testing statute, Wis. Stat. § 974.07. Second, we discuss State v. Moran, 2005 WI 115, 284 Wis. 2d 24, 700 N.W.2d 884, our 2005

23

decision interpreting portions of that statute, and overrule a part of <u>Moran</u>'s interpretation of Wis. Stat. § 974.07(6). Finally, we examine whether the circuit court erred in denying Denny's postconviction motion for forensic DNA testing of certain evidence, and conclude that it did not.

### A. Wisconsin Stat. § 974.07

¶48 We begin with an overview of Wis. Stat. § 974.07, "Motion for postconviction deoxyribonucleic acid testing of certain evidence." Wis. Stat. § 974.07. The statute is composed of 13 subsections, but the core of the testing regime is contained in subsections (2), (6), (7), (9)-(10), and (12). Respectively, these subsections govern: making a motion for postconviction forensic DNA testing; the sharing of pertinent information and evidence between the district attorney and the movant; the circuit court's decision on the movant's motion; disposition of the case; and payment of the costs of testing.

¶49 The process begins in sub. (2) when one of a few types of persons entitled to do so——here, a person "convicted of a crime"——"make[s] a motion [in the proper court] for an order requiring forensic [DNA] testing of evidence". Wis. Stat. § 974.07(2).[9] Critical to an understanding of the entire statute is that the framework functions to dispose of a "<u>motion</u> . . . for an <u>order</u>." <u>Id.</u> (emphases added).

---

[9] Subsection (1) contains definitions. <u>See</u> Wis. Stat. § 974.07(1).

24

Importantly, the evidence sought to be tested must meet three requirements under sub. (2):

> (a) The evidence is relevant to the investigation or prosecution that resulted in the conviction, adjudication, or finding of not guilty by reason of mental disease or defect.

> (b) The evidence is in the actual or constructive possession of a government agency.

> (c) The evidence has not previously been subjected to forensic [DNA] testing or, if the evidence has previously been tested, it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results.

Wis. Stat. § 974.07(2)(a)-(c).

¶50 Next, sub. (6) enables "the movant" to obtain access to certain information and evidence possessed by "the district attorney," and vice versa.[10] Specifically:

> (a) Upon demand the district attorney shall disclose to the movant or his or her attorney whether biological material has been tested and shall make

---

[10] Subsections (3) and (4) involve notice requirements aimed at apprising the appropriate district attorney's office and the victim of the motion proceedings and giving the district attorney the chance to "respond" to the motion. See Wis. Stat. § 974.07(3)-(4).

Subsection (5) requires the district attorney, upon receipt of the motion or notice from a court of the motion, to "take all actions necessary to ensure that all biological material that was collected in connection with the investigation or prosecution of the case and that remains in the actual or constructive custody of a government agency is preserved pending completion of the proceedings under this section." Wis. Stat. § 974.07(5).

25

available to the movant or his or her attorney the following material:

    1. Findings based on testing of biological materials.

    2. Physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material.

    (b) Upon demand the movant or his or her attorney shall disclose to the district attorney whether biological material has been tested and shall make available to the district attorney the following material:

    1. Findings based on testing of biological materials.

    2. The movant's biological specimen.

Wis. Stat. § 974.07(6)(a)-(b). This information and material must be "relevant to the movant's claim at issue in the motion made under sub. (2)." § 974.07(6)(d). Subsection (6) also enables the court to "impose reasonable conditions on availability of material requested under pars. (a) 2. and (b) 2. in order to protect the integrity of the evidence." § 974.07(6)(c).

¶51 Subsection (7) governs the circuit court's decision on the movant's motion. Subsection (7) sets forth two means by which a movant may obtain forensic DNA testing under the statute: first, the court "shall order" testing if the four requirements of Wis. Stat. § 974.07(7)(a) "apply"; second, the court "may order" testing if the three requirements of § 974.07(7)(b) "apply." § 974.07(7)(a)-(b).

¶52 Both avenues to testing require that "[t]he evidence to be tested meets the conditions under sub. (2)(a) to (c)" (set forth above). Wis. Stat. § 974.07(7)(a)3., (b)2. Both also require that the "chain of custody of the evidence to be tested establishes that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the evidence, the testing itself can establish the integrity of the evidence." § 974.07(7)(a)4., (b)3.

¶53 The two sets of requirements differ in two crucial respects. First, a court "may order" testing if, among other things:

> It is reasonably probable that the outcome of the proceedings that resulted in the conviction, the finding of not guilty by reason of mental disease or defect, or the delinquency adjudication for the offense at issue in the motion under sub. (2), or the terms of the sentence, the commitment under s. 971.17, or the disposition under ch. 938, would have been more favorable to the movant if the results of [DNA] testing had been available before he or she was prosecuted, convicted, found not guilty by reason of mental disease or defect, or adjudicated delinquent for the offense.

Wis. Stat. § 974.07(7)(b)1. In contrast, a court "shall order" testing if, among other things:

> It is reasonably probable that the movant would not have been prosecuted, convicted, found not guilty by reason of mental disease or defect, or adjudicated delinquent for the offense at issue in the motion under sub. (2), if exculpatory [DNA] testing results had been available before the prosecution, conviction, finding of not guilty, or adjudication for the offense.

27

§ 974.07(7)(a)2.

¶54 Second, the mandatory testing scheme includes an additional requirement: "[t]he movant [must] claim[] that he or she is innocent of the offense at issue in the motion under sub. (2)." Wis. Stat. § 974.07(7)(a)1.

¶55 Subsections (9) and (10) govern disposition of the case following the circuit court's decision under sub. (7) and any testing that occurs.[11] Under sub. (9), if the court does not order forensic DNA testing, "or if the results of forensic [DNA] testing ordered under this section are not supportive of the movant's claim, the court shall determine the disposition of the evidence specified in the motion subject to" certain particulars. Wis. Stat. § 974.07(9)(a)-(b).

¶56 Under sub. (10)(a):

> If the results of forensic [DNA] testing ordered under this section support the movant's claim, the court shall schedule a hearing to determine the appropriate relief to be granted to the movant. After the hearing, and based on the results of the testing and any evidence or other matter presented at the hearing, the court shall enter any order that serves the interests of justice . . . .

Wis. Stat. § 974.07(10)(a). Subsection (10)(a) provides examples of orders the court may enter, such as "[a]n order

---

[11] Subsection (8) authorizes the court to "impose reasonable conditions on any testing ordered under this section in order to protect the integrity of the evidence and the testing process." Wis. Stat. § 974.07(8). The subsection also discusses where testing may take place. Id.

28

granting the movant a new trial or fact-finding hearing." § 974.07(10)(a)2.

¶57 Finally, sub. (12) pertains to payment of the costs of testing.[12] First, "[t]he court may order a movant to pay the costs of any testing ordered by the court under this section if the court determines that the movant is not indigent." Wis. Stat. § 974.07(12)(a). Indigency is defined via guidelines set forth in § 974.07(12)(b). Second, "[t]he state crime laboratories shall pay for testing ordered under this section and performed by a facility other than the state crime laboratories if the court does not order the movant to pay for the testing." § 974.07(12)(c).[13]

¶58 Having set forth the relevant provisions of Wis. Stat. § 974.07, we now discuss Moran.

### B.   State v. Moran

---

[12] Subsection (10)(b) exempts a court ordering a new trial under (10)(a) from the necessity of "making the findings specified in s. 805.15 (3)(a) and (b)." Wis. Stat. § 974.07(10)(b). Wisconsin Stat. § 805.15(3) relates to new trials "ordered on the grounds of newly-discovered evidence." Wis. Stat. § 805.15(3).

Subsection (11) requires a court to "refer the movant to the state public defender for determination of indigency and appointment of counsel under s. 977.05(4)(j)" under specified circumstances. Wis. Stat. § 974.07(11).

[13] The final subsection of the statute, sub. (13), explains that "[a]n appeal may be taken from an order entered under this section as from a final judgment." Wis. Stat. § 974.07(13).

¶59 As shown above, whether a movant may obtain postconviction forensic DNA testing of evidence depends on, among other things, whether one of the two "reasonably probable" formulations set forth in Wis. Stat. § 974.07(7) applies in the case. Before this court, Denny argues that "[i]t is reasonably probable that [he] would not have been prosecuted . . . [or] convicted" of his crime "if exculpatory [DNA] testing results had been available before the prosecution . . . [or] conviction." § 974.07(7)(a)2.[14] As we explain in the next section, this contention fails.

¶60 But we must first discuss our decision in Moran because Denny claims that under Moran he is entitled to forensic DNA testing under Wis. Stat. § 974.07(6) even if § 974.07(7)(a)2. remains unmet. While we agree that Moran supports this claim, we overrule this interpretation of § 974.07(6).

¶61 The movant in Moran——who had been convicted of crimes relating to an incident during which he allegedly injured two individuals with a knife——sought postconviction forensic DNA testing of certain blood samples pursuant to Wis. Stat. § 974.07. Moran, 284 Wis. 2d 24, ¶¶5-20, 22-24. Before assessing the merits of the case, we explained:

> In their briefs, the parties focused our attention almost exclusively on § 974.07(7),

_____

[14] Denny does not develop an argument suggesting that testing under Wis. Stat. § 974.07(7)(b)1. is appropriate. We do not address application of that provision.

pertaining to court-ordered DNA testing. However, at oral argument on April 12, 2005, [defense] counsel directed our attention to § 974.07(6), under which a movant may request certain biological material from the district attorney. We requested supplemental briefs from both parties regarding the impact of [the movant's] argument under § 974.07(6).

Id., ¶25. Proceeding to the interpretation of the statute, we concluded that § 974.07(6) provided the movant not only access to "[p]hysical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material," § 974.07(6)(a)2., but also "the right to test the sought-after evidence containing biological material" at his own expense, assuming other statutory conditions were met. Moran, 284 Wis. 2d 24, ¶¶43, 57.

¶62 We did "acknowledge the plausibility of the position that all motions for testing, as opposed to inspection, should proceed under Wis. Stat. § [974].07(7)." Id., ¶49. But we rejected this interpretation. In our view, "[s]ubsection (6) allows the movant access to the test results and/or material under some circumstances, but the movant must decide whether to test the material and must pay for the testing himself. Subsection (7), on the other hand, pertains to court-ordered testing at the State's expense." Id., ¶55. We thus drew a distinction between testing at private expense under Wis. Stat. § 974.07(6) and testing at public expense under § 974.07(7). See id., ¶57 ("Moran must conduct any testing of the evidence at his own expense. If a movant seeks DNA testing at public expense, the movant must proceed under § 974.07(7)(a) or (b),

31

and satisfy the heightened requirements in subsection (7)."); id., ¶56 ("We are unable to discern from the plain language of § 974.07 a clear legislative intent to block testing demanded by a person willing and able to pay until that person satisfies the requirements for publicly funded DNA testing.").

¶63 Today we conclude that, for several reasons, this interpretation constitutes an error which we must now correct.[15]

¶64 To begin with, Wis. Stat. § 974.07(6) says nothing about allowing the movant to conduct forensic DNA testing of evidence. See § 974.07(6). Subsection (6)(a) states only that the district attorney must "make available" the specified physical evidence. § 974.07(6)(a). It does not authorize the movant to send away the evidence for testing. We understand the argument that sub. (6) does not explicitly prohibit a movant from testing evidence, either. But "[c]ontext" and "the structure of the statute in which the operative language appears" are "important to meaning." Kalal, 271 Wis. 2d 633, ¶46. "A statute's purpose . . . may be readily apparent . . . from its context or the structure of the statute as a coherent whole." Id., ¶49.

¶65 Review of the whole statute leads us to conclude that the "textually [and] contextually manifest statutory purpose" of

_____

[15] Although the State did not raise this issue in its petition for review, we exercise our discretion to address it anyway. See, e.g., State v. Moran, 2005 WI 115, ¶¶29-31, 284 Wis. 2d 24, 700 N.W.2d 884 (citing Apex Elecs. Corp. v. Gee, 217 Wis. 2d 378, 384, 577 N.W.2d 23 (1998)).

Wis. Stat. § 974.07 is for a movant to obtain "an order requiring forensic [DNA] testing" of certain evidence. § 974.07(2). In fact, the subsection from which this language is taken, sub. (2), is cited in subs. (3), (4), (5), (6), (7), (9), and (11) of the statute. See § 974.07(3)-(7), (9), (11). Subsection (2) is the linchpin of the testing regime. Subsection (6) in particular contains a provision explaining that sub. (6) "does not apply unless the information being disclosed or the material being made available is relevant to the movant's claim at issue in the motion made under sub. (2) [for an order requiring forensic DNA testing]." § 974.07(6)(d). Subsection (7) explains the conditions under which an order will issue, and subsection (12) of the statute determines whether testing occurring pursuant to this order will take place at public or private expense. See § 974.07(7), (12). The "order" continually referred to is undoubtedly the "order" discussed in sub. (7). § 974.07(7)(a)-(b).

¶66 We find it unlikely that the legislature would set forth detailed requirements regarding whether DNA testing may occur (sub. (7)) and who will pay for that testing (sub. (12)), only for a movant to bypass these provisions and obtain testing at private expense using a subsection of the statute that does not say a word about such testing. Further, allowing testing under sub. (6) would require only the barest of showings. See Moran, 284 Wis. 2d 24, ¶3. It is equally difficult to believe that the statute is most properly read to permit convicted offenders who are unable to meet the surmountable sub. (7)

33

standard to engage in postconviction fishing expeditions in attempts to cast doubt upon and upset those convictions.

¶67 Moran did not even discuss sub. (12). In Moran we suggested that sub. (6) related to testing at private expense, while sub. (7) related to testing at public expense. See id., ¶¶55, 57. But review of the entirety of the statute makes clear that sub. (12) governs whether a movant must pay for court-ordered testing. Pursuant to sub. (12), a non-indigent movant who prevails under sub. (7) may yet have to pay for the DNA testing that results. See Wis. Stat. § 974.07(12). Moran's interpretation of § 974.07(6) ignores sub. (12) entirely. While it is possible to read § 974.07 as creating two systems for testing at private expense (under subs. (6) and (12)) and one system for testing at public expense (under sub. (12)), we do not find this to be the most sensible interpretation of the statute. Again, given that the legislature took such pains in sub. (12) to explain how courts should determine who pays for testing, it would be strange for the legislature to fail to mention the costs of testing at all in sub. (6), even to explain that the movant must fund such testing himself.

¶68 Other subsections of the statute also cast doubt on Moran's interpretation of Wis. Stat. § 974.07(6). As explained, in Moran we concluded that sub. (7), as opposed to sub. (6), "pertain[s] to court-ordered DNA testing." Moran, 284 Wis. 2d 24, ¶25; see id., ¶55 ("Subsection (6) allows the movant access to the test results and/or material under some circumstances, but the movant must decide whether to test the

34

material and must pay for the testing himself. Subsection (7), on the other hand, pertains to court-ordered testing at the State's expense."). Indeed, sub. (6) says nothing about court-ordered testing. § 974.07(6). But subs. (9) and (10), which govern disposition of the case following testing——including, presumably, Moran's sub. (6) testing——speak solely in terms of testing pursuant to court order. See § 974.07(10)(a) ("If the results of forensic [DNA] testing ordered under this section support the movant's claim, the court shall schedule a hearing to determine the appropriate relief to be granted to the movant." (Emphasis added.)); § 974.07(9) ("If a court in which a motion under sub. (2) is filed does not order forensic [DNA] testing, or if the results of forensic [DNA] testing ordered under this section are not supportive of the movant's claim, the court shall determine the disposition of the evidence specified in the motion subject to the following: . . . ." (Emphases added.)). The link between subs. (9) and (10) and sub. (7) is evident, while no such link between subs. (9) and (10) and sub. (6) appears in the text of the statute. Moran did not resolve this inconsistency. See Moran, 284 Wis. 2d 24, ¶47 ("[I]f the testing [at Moran's expense] is done, the circuit court will determine whether or not the results 'support the movant's claim.' Wis. Stat. § 974.07(9)-(10).").

¶69 "This court follows the doctrine of stare decisis scrupulously because of our abiding respect for the rule of law." State v. Luedtke, 2015 WI 42, ¶40, 362 Wis. 2d 1, 863 N.W.2d 592 (quoting Johnson Controls, Inc. v. Employers Ins. of

35

Wausau, 2003 WI 108, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257); Hilton v. South Carolina Public Railways Comm'n, 502 U.S. 197, 202 (1991) ("Time and time again, this Court has recognized that 'the doctrine of stare decisis is of fundamental importance to the rule of law.'" (quoting Welch v. Texas Dep't of Highways and Public Transp., 483 U.S. 468, 494 (1987) (plurality opinion))). "[A]ny departure from the doctrine of stare decisis demands special justification." Johnson Controls, 264 Wis. 2d 60, ¶94 (quoting Schultz v. Natwick, 2002 WI 125, ¶37, 257 Wis. 2d 19, 653 N.W.2d 266). We conclude that such special justification is present in the current case, and overrule Moran's interpretation of Wis. Stat. § 974.07(6) as independently authorizing forensic DNA testing at private expense under certain circumstances. Moran, 284 Wis. 2d 24, ¶3.

¶70 For the reasons already explained, Moran's interpretation of Wis. Stat. § 974.07(6) is simply "unsound in principle." Johnson Controls, 264 Wis. 2d 60, ¶99. But the error also is not a containable one; it renders the rest of the statute incoherent in a manner we obviously did not contemplate in Moran. The decision has thus "become detrimental to coherence and consistency in the law." Id., ¶98. Moreover, in Moran we did not attempt to undertake a comprehensive examination of § 974.07; we did not analyze sub. (12) of that statute. Reconsideration of the statute with the benefit of a clear understanding of that subsection convinces us that our interpretation of sub. (6) must be modified to take account of sub. (12). Cf. Johnson Controls, 264 Wis. 2d 60, ¶98 (among the

36

"criteria in Wisconsin for overturning prior cases" are whether "changes or developments in the law have undermined the rationale behind a decision" and whether "there is a need to make a decision correspond to newly ascertained facts").[16]

---

[16] Also material to our decision to overrule Moran's understanding of the function of sub. (6) is the potential effect of that case on the legislature's determinations regarding the best way to protect the rights and interests of crime victims in Wisconsin. Although postconviction forensic DNA testing is important, and although a crime victim assuredly has an interest in seeing that the true criminal offender in a case is prosecuted, it is not difficult to imagine why such testing might cause significant distress to victims of Wis. Stat. § 974.07 movants and prevent these victims from obtaining some amount of closure following the infliction of harm upon them. Cf., e.g., State ex rel. Brown v. Bradley, 2003 WI 14, ¶25, 259 Wis. 2d 630, 658 N.W.2d 427 ("consider[ing] the interests that the State, crime victims, and others have in the finality of cases" and noting the possibility of "inequitable results" due to "open[ing] up cases that have long been thought by everyone, including crime victims, to have been final").

While not dispositive in the case at issue, we note that the legislature appears to have had crime victims in mind when enacting Wis. Stat. § 974.07. See § 974.07(4) (providing for notification of the victim of the movant's crime). It understandably needed to strike a balance between the rights and interests of convicted offenders attempting to establish their innocence and the rights and interests of crime victims, while at the same time ensuring prosecution of the actual perpetrators of crimes. Thus, although in some cases it is appropriate for this court to acquiesce in an erroneous prior decision, see, e.g., Kimble v. Marvel Entm't, LLC, 576 U.S. ___, 135 S. Ct. 2401, 2409 (2015) ("Respecting stare decisis means sticking to some wrong decisions."), doing so here is especially troubling. In essence, we would be purposefully perpetuating a much more expansive postconviction forensic DNA testing regime than the legislature saw fit to enact, to the possible detriment of Wisconsin crime victims.

¶71 Ultimately stare decisis is a "'principle of policy' rather than 'an inexorable command.'" Hohn v. United States, 524 U.S. 236, 251 (1998) (quoting Payne v. Tennessee, 501 U.S. 808, 828 (1991)). Each suggestion that one of our cases must be overturned must be scrutinized individually, and sometimes stare decisis must yield to other important principles of policy. This is one such occasion. We thus overrule Moran insofar as it concluded that "the plain language of § 974.07(6) gives a movant the right to conduct DNA testing of physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material, if the movant meets several statutory prerequisites." Moran, 284 Wis. 2d 24, ¶3 (emphasis omitted). Henceforth, we adopt the interpretation we "acknowledge[d]" as "plausib[le]" in Moran: that "all motions for testing . . . should proceed under Wis. Stat. § [974].07(7)." Id., ¶49. Wisconsin Stat. § 974.07(6) should be applied according to its terms, allowing the district attorney and the movant to share information and "make available" specified material. See § 974.07(6)(a)-(b). Of course, § 974.07(6) provides "the movant or his or her attorney" with the ability to obtain "whether biological material has been tested," "[f]indings based on testing of biological materials," and "[p]hysical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological material," as long as

38

the requirements of the statute are otherwise met. § 974.07(6)(a)1.-2.[17]

¶72 This opinion should not be read to denigrate the importance of postconviction forensic DNA testing. "The advent of DNA technology is one of the most significant scientific advancements of our era," and "the utility of DNA identification in the criminal justice system is already undisputed." Maryland v. King, 569 U.S. ___, 133 S. Ct. 1958, 1966 (2013). Under Wis. Stat. § 974.07, properly interpreted, convicted offenders can obtain postconviction forensic DNA testing of evidence. This opinion simply recognizes the existence of, and applies, the limits that the legislature set on such testing.[18]

### C. Whether the Circuit Court Erred in Denying Denny's Postconviction Motion for Forensic DNA Testing of Certain Evidence

---

[17] For those who would argue that sub. (6) is of little value because it only allows inspection and does not independently allow for testing, the facts in the case at issue demonstrate why inspection is useful. For example, in his supplemental motion for postconviction forensic DNA testing, Denny explained that after filing his initial motion, two law students assisting him "reviewed the physical evidence on file at the Ozaukee County Clerk of Courts" and "found additional items with which the perpetrator likely came into contact that were previously overlooked." Denny then supplemented his initial request, "seek[ing] to have additional items subjected to DNA testing." Thus, the ability to inspect allows one to ascertain what, if any, testing should be sought.

[18] We note also that, in some cases, the parties may stipulate to testing. We deal here with a contested motion for DNA testing.

¶73 We now address the merits of Denny's postconviction motion for forensic DNA testing. Although there are a number of conditions that Denny must meet before a court may conclude he is entitled to testing, see, e.g., Wis. Stat. § 974.07(2), we find it appropriate to decide this case on the basis of § 974.07(7)(a)2. alone. Because this provision is fatal to Denny's claim, we need not address whether he has satisfied other portions of the statute. See, e.g., Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Typically, an appellate court should decide cases on the narrowest possible grounds." (citing State v. Blalock, 150 Wis. 2d 688, 703, 442 N.W.2d 514 (Ct. App. 1989)).

¶74 In State v. Hudson, 2004 WI App 99, 273 Wis. 2d 707, 681 N.W.2d 316, decided before Moran, the court of appeals addressed the proper standard of review to apply to the circuit court's decision regarding whether a movant has satisfied Wis. Stat. § 974.07(7)(a)2. See Hudson, 273 Wis. 2d 707, ¶¶13-16. The court concluded that an erroneous exercise of discretion standard should be used. Id., ¶16. In Moran the parties briefed the question of the standard of review that this court should apply in reviewing circuit court decisions pertaining to § 974.07(7)(a)2. and (b)1. The movant argued that a de novo standard was appropriate for the former, and an erroneous exercise of discretion standard was appropriate for the latter. The State's position was somewhat more complicated. However, Moran did not definitively settle the issue.

40

¶75 Here, the parties barely addressed the standard of review applicable to Wis. Stat. § 974.07(a)2., although the State suggests that a deferential approach is appropriate. We need not decide this issue without adequate briefing, because Denny's claim fails whether we review the circuit court's conclusions under a deferential standard or de novo.

¶76 The question before this court is whether "[i]t is reasonably probable that [Denny] would not have been prosecuted [or] convicted" of his crime "if exculpatory [DNA] testing results had been available before the prosecution [or] conviction." Wis. Stat. § 974.07(7)(a)2. The State does not dispute that we are to assume for purposes of this analysis that if DNA testing were to occur, the results would be "exculpatory." Denny argues that "[t]hree types of DNA test results would create a reasonable probability of a different result: DNA that matches a convicted offender; DNA that excludes Denny and Kent on all items; or DNA on multiple items matching the same unknown third party."[19]

¶77 Like the circuit court, we are convinced that Wis. Stat. § 974.07(7)(a)2. has not been met. The evidence

---

[19] Whether we are bound to consider each of Denny's hypothetical sets of test results exactly as he has presented them is not settled. For example, the State does not necessarily concede that "exculpatory" means that the DNA would "match[] a convicted offender." Regardless, we will assume without definitively resolving the issue that Denny's interpretation of the statute is valid given that it does not change the result in this case.

41

incriminating Denny was, to put it mildly, extensive.  Testimony indicated that Denny confessed, made inculpatory statements to, and took inculpatory actions in front of, multiple witnesses.  "[T]he statements were . . . made at different times and places, in some instances corroborated by physical evidence."  _Denny v. Gudmanson_, 252 F.3d at 905.[20]

---

[20] In 1987 Denny attempted to obtain a new trial "arguing that the admission of Kent['s] . . . confessions violated his rights under the Confrontation Clause of the Sixth Amendment as interpreted in the Supreme Court's decision of" _Cruz v. New York_, 481 U.S. 186 (1987).  _Denny v. Gudmanson_, 252 F.3d 896, 899 (7th Cir. 2001).  The court of appeals affirmed the circuit court order denying Denny's motion, concluding that "Kent's statements were directly admissible against [Denny]," but that "even if Kent's statements were not directly admissible, it was harmless error to admit them."  _State v. Denny_, 163 Wis. 2d 352, 355, 359, 471 N.W.2d 606 (Ct. App. 1991).  Thereafter, Denny filed a petition for a writ of habeas corpus in federal court, and both the Seventh Circuit and the district court below it denied relief.  _See_ _Denny v. Gudmanson_, 252 F.3d at 899, 905.  The Supreme Court of the United States denied certiorari.  _Denny v. Gudmanson_, 534 U.S. 938 (2001).

Case law pertaining to the Confrontation Clause has developed in the time since these other proceedings.  _Compare, e.g._, _Denny v. Gudmanson_, 252 F.3d at 902-03 (discussing _Ohio v. Roberts_, 448 U.S. 56 (1980)), _with_ _Crawford v. Washington_, 541 U.S. 36, 69 (2004) (Rehnquist, C.J., concurring in the judgment) (criticizing "the Court's decision to overrule" _Roberts_).  Denny does not now suggest that consideration of certain portions of the testimony presented at the trial against him is improper.  Consequently, in our discussion of the background of this case, above, we provided the testimony introduced at Denny's trial as it actually occurred, including statements allegedly made by both Kent and Denny.  Nevertheless, and without expressing an opinion on any constitutional question, we observe that our decision would be the same even if we did not consider Kent's statements.  _Cf._ _State v. Denny_, 163 Wis. 2d at 359 ("Upon reviewing the record, we conclude there is evidence sufficient to convict [Denny] even without the statements made by Kent.").

¶78 Additionally, given the way this case proceeded, the reasoning of the circuit court below is sound: "Mohr's killing has never been presented as a single-perpetrator crime. . . . Finding DNA from persons other than Denny"——even convicted offenders——"would not 'prove Denny's innocence.' It may only reveal the identity of others who may have been involved." In light of this fact, and given that there is no single account of what transpired in this case, the absence of DNA belonging to Denny and Kent would not be particularly compelling, either. Indeed, the fact that there were various inconsistencies between the accounts of the witnesses actually serves to insulate Denny's conviction.

¶79 We note (as did the circuit court) that the jury in Denny's case was even presented with a less-sophisticated preview of what Denny now seeks to obtain through DNA testing: two of the hairs tested by Nilsson using "microscopic comparison" were not consistent with samples taken from Mohr, Denny, or Kent. In other words, the jury was <u>aware</u> of the possibility that an unknown third party might have been involved.

¶80 Denny suggests that the witnesses in his case were not credible——because of, for example, grants of immunity or of admitted drug and alcohol use at pertinent times——but of course the jury was not convinced by this line of argument. The idea that the DNA results Denny seeks would tip the scales and cause police or a jury to reject the substantial evidence against Denny is simply conjecture.

43

¶81 In sum, Wis. Stat. § 974.07(7)(a)2. has not been met.[21] Even if exculpatory DNA testing results were available before prosecution and conviction, we are unable to conclude that it is reasonably probable that Denny would not have been prosecuted or convicted of his crime. As put by the separate writing below, "The evidence was vast, overwhelming, and damning. It was not even close." Denny, 368 Wis. 2d 363, ¶86 (Hagedorn, J., concurring in part and dissenting in part). The circuit court below compared this case to hypothetical cases in which the truth of who really committed the crime is more readily verified through DNA testing, such as one involving "a semen match in a single assailant sexual assault." The evidence provided by the

---

[21] The parties offer nuanced, and differing, interpretations of the phrase "reasonably probable." Wis. Stat. § 974.07(7)(a)2. The State asserts that "reasonably probable" means a "reasonable probability that a jury, looking at both the [old evidence] and the [new evidence], would have a reasonable doubt as to the defendant's guilt." State v. McCallum, 208 Wis. 2d 463, 475, 561 N.W.2d 707 (1997). In contrast, Denny believes that "reasonably probable" means "a probability sufficient to undermine confidence in the outcome." Strickland v. Washington, 466 U.S. 668, 694 (1984). We decline to resolve the parties' dispute over the precise meaning of "reasonably probable," given that Denny's motion should be denied under either standard. See Maryland Arms Ltd. P'ship v. Connell, 2010 WI 64, ¶48, 326 Wis. 2d 300, 786 N.W.2d 15 ("Issues that are not dispositive need not be addressed." (citing Gross v. Hoffman, 227 Wis. 296, 300, 277 N.W. 663 (1938)).

44

State in 1982 is not so easily displaced.[22] The circuit court below correctly denied Denny's motion.[23]

## IV. CONCLUSION

¶82 We conclude that the circuit court did not err in denying Denny's postconviction motion for forensic DNA testing of certain evidence. Consequently, we reverse the decision of the court of appeals.

---

[22] This is not to say that Wis. Stat. § 974.07(7)(a)2. will only be satisfied in cases involving a single perpetrator. For instance, there may be cases involving multiple actors in which the preconviction evidence establishes that the movant could only have played one role in the crime and postconviction forensic DNA testing sufficiently discredits that possibility. Because those circumstances are not present here, we need not analyze this issue further.

[23] Citing State v. Hudson, 2004 WI App 99, ¶16, 273 Wis. 2d 707, 681 N.W.2d 316, for the proposition that a circuit court's determination under Wis. Stat. § 974.07(7)(a)2. is reviewed for an erroneous exercise of discretion, the court of appeals below concluded that the circuit court applied multiple "improper standards of law" in reaching its ultimate decision regarding § 974.07(7)(a)2. Denny, 368 Wis. 2d 363, ¶59. More specifically, the court of appeals found error in certain conclusions of the circuit court relating to the relevance of the evidence that Denny sought to test and whether those results would be exculpatory or could exculpate Denny. Id., ¶¶38, 59. Regardless of the propriety of these conclusions or of the technical accuracy of the court's phrasing of certain legal propositions, review of the circuit court's entire decision makes clear that it properly analyzed the question at issue here, namely whether § 974.07(7)(a)2. was met. Cf., e.g., Englewood Cmty. Apartments Ltd. P'ship v. Alexander Grant & Co., 119 Wis. 2d 34, 39 n.3, 349 N.W.2d 716 (Ct. App. 1984) ("[R]emand directing the trial court to make an explicit finding where it has already made unmistakable but implicit findings to the same effect would be both superfluous and a waste of judicial resources.").

*By the Court.*—The decision of the court of appeals is reversed.

¶83 PATIENCE DRAKE ROGGENSACK, C.J.  *(concurring in part, dissenting in part).*  Although the majority opinion correctly overrules <u>Moran</u>'s interpretation of Wis. Stat. § 974.07(6), in which portion of the opinion I concur and join, I dissent from the part of the majority opinion that concludes that Jeffrey Denny is not entitled to DNA testing of evidence collected at the crime scene.  I conclude that Denny met the statutory requirements of Wis. Stat. § 974.07(7)(a); and therefore, the circuit court was required to grant Denny's motion for forensic DNA testing.  Accordingly, I respectfully concur in part and dissent in part with, and from, the majority opinion.

## I.  BACKGROUND

¶84 The majority opinion ably sets forth the facts that underlie the dispute before us.  I will not repeat them, in full, here.  However, I do relate a few facts to turn the reader's attention to my discussion that follows.

¶85 On January 26, 1982, Christopher Mohr was found dead in his home by Jonathan Leatherman.  Police received a tip that Kent Denny was involved in the crime.  Eventually, the police pursued Kent's brother, Jeffrey Denny (Denny), as a suspect.  Both Denny and Kent were charged with first-degree homicide and were tried together.  On November 15, 1982, the jury found Denny and Kent guilty.

¶86 On May 1, 2014, Denny filed a motion for postconviction forensic DNA testing pursuant to Wis. Stat. § 974.07(7)(a).  As the majority opinion notes, Denny claimed he

1

was innocent of the murder and sought DNA testing of several objects recovered from the crime scene. These items include: "(1) the large section of a bong pipe; (2) the base of the bong pipe; (3) the hairs collected from the victim's left hand; (4) stray hairs found on various items of clothing from the victim's body; (5) a yellow hand towel; and (6) facial breathing masks found at the scene."[1] In a supplemental memorandum, Denny asked for DNA testing of several additional items: "(1) additional pieces of the bong pipe; (2) blood from the metal chair found by the victim's head; (3) the victim's bloody clothing; (4) the bloody hat found near the victim; (5) the bloody gloves found near the victim; (6) stray hairs found on various items of clothing from the victim's body; (7) the victim's hair; (8) the lighter found under the victim's body; (9) the screens found on the victim's body; and (10) the glass cup found near the victim."[2]

¶87  The circuit court denied Denny's motion, but the court of appeals reversed. We granted the State's petition for review.

---

[1] Denny's Mot. for Postconviction DNA testing (May 1, 2014).

[2] Denny's Supp. Mot. for Postconviction DNA testing (August 4, 2014).

## II. DISCUSSION

### A. Standard of Review

¶88 This case requires us to interpret and apply Wis. Stat. § 974.07. "Questions of statutory interpretation and application are questions of law that we review independently." State v. Hanson, 2001 WI 4, ¶14, 338 Wis. 2d 243, 808 N.W.2d 390.

### B. General Wis. Stat. § 974.07 Principles

¶89 Denny sought DNA testing pursuant to Wis. Stat. § 974.07(7)(a). Unlike § 974.07(7)(b) in which the circuit court has discretion, paragraph § 974.07(7)(a) requires the circuit court to order DNA testing if the movant satisfies the criteria set forth therein. The difference in the two provisions, as the majority opinion correctly notes, is that a movant is required to maintain his innocence in order to prevail on a motion for DNA testing made pursuant to paragraph (a).

¶90 Wisconsin Stat. § 974.07(7)(a) has four requirements a movant must meet in order to be successful. First, as mentioned above, the defendant must maintain "that he or she is innocent of the offense." Wis. Stat. § 947.07(7)(a)1.

¶91 Second, it must be "reasonably probable that the movant would not have been . . . convicted . . . if exculpatory deoxyribonucleic acid testing results had been available before the prosecution, [or] conviction, . . . ." Wis. Stat. § 947.07(7)(a)2.

¶92 "Reasonably probable" is an outcome determinative test akin to the test we apply when determining if newly discovered evidence warrants a new trial. Similar to the test we apply in

3

that context, "we must determine whether there is a reasonable probability that a jury, looking at all the relevant evidence in regard to whether the defendant did or did not commit the crime, would have reasonable doubt as to the defendant's guilt. This examination requires an assessment of all the evidence to determine what effect, if any, the newly discovered evidence would be reasonably probable to have on a jury's verdict at a new trial." State v. Armstrong, 2005 WI 119, ¶167, 283 Wis. 2d 639, 700 N.W.2d 98 (Roggensack, J., dissenting) (internal citation marks omitted). Moreover, under this prong, the plain language of Wis. Stat. 947.07(7)(a)2. requires that we are to assume, as we consider Denny's motion, that all of the evidence he seeks to have tested will be exculpatory because the test he must meet, which is set out in subdivision (a)2., concerns "exculpatory deoxyribonucleic acid testing results."[3] Stated otherwise, if we did not assume that the DNA testing results would be exculpatory, we could not decide whether it would be reasonably probable that Denny would not have been convicted if the DNA testing results had been available at trial.

¶93 Third, pursuant to Wis. Stat. § 974.07(7)(a)3., the movant must meet the criteria set forth in § 974.07(2)(a)-(c). Section 974.07(2)(a) provides that "[t]he evidence [must be] relevant to the investigation or prosecution that resulted in the conviction." The evidence must be in the possession of a

---

[3] Exculpatory evidence is defined as "Evidence tending to establish a criminal defendant's innocence." Exculpatory Evidence, Black's Law Dictionary 637 (9th ed. 2009).

4

government agency. Wis. Stat. § 974.07(2)(b). Finally, the evidence was not "previously [] subjected to forensic deoxyribonucleic acid testing or, if the evidence has previously been tested, it may now be subjected to another test using a scientific technique that was not available or was not utilized at the time of the previous testing and that provides a reasonable likelihood of more accurate and probative results." Wis. Stat. § 974.07(2)(c). If a movant meets each of these criteria, then he has satisfied the third statutory requirement necessary to obtain DNA testing.

¶94 Fourth, "The chain of custody of the evidence to be tested [must] establish[] that the evidence has not been tampered with, replaced, or altered in any material respect or, if the chain of custody does not establish the integrity of the evidence, the testing itself can establish the integrity of the evidence." Wis. Stat. § 974.07(7)(a)4. This requirement ensures the integrity of the evidence the defendant seeks to test.

¶95 As discussed above, Wis. Stat. § 974.07(7)(a) provides that a movant who meets each of these statutory criteria is entitled to DNA testing of evidence relevant to the crime of which he was convicted.

5

C. Denny's Motion for DNA Testing

¶96 In the present case, we must decide whether Denny satisfied the criteria set forth in Wis. Stat. § 974.07(7)(a). Contrary to the majority, I would conclude that Denny has met the statutory requirements, and therefore his motion for postconviction DNA testing must be granted.

¶97 Without discussion of the remaining statutory requirements,[4] the majority concludes that Denny has not fulfilled the second statutory criteria. In essence, the majority holds that it is not "reasonably probable that [Denny] would not have been prosecuted. . . [or] convicted of his crime if exculpatory [DNA] testing results had been available."[5]

¶98 Consistent with the circuit court's analysis, the majority reasons that the State did not present this to the jury as a single-perpetrator crime. The majority's analysis can be summed up simply: the State theorized that other individuals were involved in the crime, and some witnesses testified that Denny was minimally involved, so a lack of Denny's DNA on the

---

[4] There is no dispute that Denny has satisfied the other three statutory requirements. First, as required by § 974.07(7)(a)1., Denny has consistently maintained his innocence. See Denny's motion for postconviction DNA testing (May 1, 2013). Likewise, Denny has satisfied the criteria set forth in the third factor: the DNA evidence is relevant; in the possession of the Ozaukee County Clerk of Courts office, which is a government entity; and neither party contends that the evidence has previously been tested. Similarly, Denny satisfied the fourth criteria as the State does not contend that the evidence has been tampered with or that the chain of custody has been broken, and nothing in the record suggests otherwise.

[5] Majority op., ¶76.

6

objects retrieved from the scene of the crime is not exculpatory.

¶99 However, the majority's conclusion is misplaced for two interrelated reasons. First, it understates the importance of the manner in which the State actually tried the case. Specifically, the State presented witness after witness that testified Denny was at the scene of the crime, including specific details about Denny's active participation in physically attacking Mohr. Second, if Denny's DNA is not found on any of the objects for which DNA testing is sought, the majority's analysis undervalues the potential of this lack of DNA evidence. This is so because it would suggest that testimony placing Denny at the scene of the crime and physically attacking Mohr was not reliable.

¶100 For example, Trent Denny, Denny's brother, testified that Denny admitted he had stabbed Mohr. According to Trent, Mohr "was coming after [Denny] while [Denny] was stabbing him." Another witness, Lori Ann Jastor Commons, related that Kent stated Denny had stabbed Mohr. Steven Hansen testified at trial that Denny had kicked Mohr. Patricia Robran testified that Denny had informed her that "Kent stabbed [Mohr] first and he handed [Denny] the knife and Kent told him to continue what he was doing until he got back, so [Denny] did, and he didn't remember if he did it five or ten or fifteen times." An inmate at Ozaukee County Jail testified that Denny confessed he "hit [Mohr] over the head with a bong and kicked him a couple times." Tammy Whitaker testified that Denny told her two versions of how

7

the murder occurred, both of which involved Denny's active participation in the murder. Another witness testified that Denny stated he had a scratch on his leg where Mohr had scratched him during their struggle.

¶101 Consequently, the State relied on the testimony of numerous witnesses to prove Denny's direct involvement in the murder by physically attacking Mohr. DNA testing of the evidence from the scene of the crime may well impact whether this testimony about Denny's involvement was true. Stated otherwise, if none of Denny's DNA is on any of the articles for which DNA testing is requested, the jury could have a reasonable doubt whether Denny committed the crime.

¶102 Additionally, this is not a case in which a dearth of material recovered from the scene of the crime would make DNA testing futile; rather, the police obtained numerous articles that likely contain DNA. The sheer number of articles to be tested makes Denny's point all the more compelling. If he was actively involved in the murder by physically attacking Mohr, one or more of the objects should contain traces of his DNA. And, as discussed above, Wis. Stat. § 974.07(7)(a)2. requires us to assume that there will be no trace of Denny's DNA because we assume the evidence is exculpatory as we consider whether to grant his postconviction motion.

¶103 A brief description of what the police recovered from the scene of the crime is helpful to understand the import of this evidence. When police arrived at the scene, a bong pipe was shattered around Mohr's body. An officer that was at the

8

crime scene testified that there were large amounts of blood on pieces of the bong pipe. Denny seeks testing of this pipe and its broken pieces to determine if it contains DNA. The bong pipe is particularly relevant to Denny's claim of innocence because the State presented testimony at trial that Denny struck Mohr in the head with the bong pipe. A lack of Denny's DNA on the bong pipe could suggest that Denny had not touched it, and directly undermine this trial testimony.

¶104 Moreover, Denny seeks testing of several hairs that an officer found in Mohr's left hand. It requires little speculation to surmise that these hairs likely belong to an individual that was actively involved in the crime. And the State presented testimony at trial that Denny was one of these individuals. If the hairs do not belong to Denny, it could lead a juror to doubt testimony about his active involvement.

¶105 The same analysis applies to the numerous strands of hair stuck to Mohr's body by dried blood. The State's theory of the crime involved a struggle between Denny and Mohr. And, several witnesses testified that Denny stabbed Mohr. A juror could justifiably question the credibility of this testimony if none of the hairs found belonged to Denny.

¶106 Accordingly, the articles that Denny seeks to have tested for DNA are not only numerous, but also highly relevant to the testimony the State presented against Denny at trial. Evidence that could show Denny was not at the scene of the crime could affect the credibility of the State's witnesses.

¶107 Of course, this is not to imply that the testimony against Denny at trial was not substantial. Yet, if the large quantity of evidence found at the scene is presumed to be exculpatory, i.e. none of it contains Denny's DNA, then the testimony proffered against Denny at his trial would be significantly undercut. And, this is where the majority errs. It does not adequately view the evidence in light of the State's trial presentation of the case.

¶108 If the DNA testing shows none of Denny's DNA, given the State's trial presentation of the case, it is reasonably probable that one or more jurors would have had reasonable doubt as to Denny's involvement in the crime. Stated more fully, one juror could have concluded that the State's theory that Denny actively participated in the murder of Mohr was untenable given the lack of Denny's DNA at the scene of the crime, which could suggest that Denny was not there.

¶109 Accordingly, I conclude that Denny is entitled to forensic DNA testing in the present case. Finally, I note that Denny is not necessarily entitled to a new trial regardless of the results of the DNA tests. Supreme court review is limited to whether Denny met the statutory criteria to entitle him to DNA testing.[6]

---

[6] Likewise, I do not address whether this testing should be at Denny's or the public's expense as that is a matter reserved for the circuit court.

10

III. CONCLUSION

¶110 In light of the foregoing, although the majority opinion correctly overrules Moran's interpretation of Wis. Stat. § 974.07(6), in which decision I concur, I dissent from its conclusion affirming the circuit court's refusal to order forensic DNA testing. Accordingly, I would affirm the court of appeals, although on a different basis, and I respectfully concur in part and dissent in part from the majority opinion.

¶111 SHIRLEY S. ABRAHAMSON, J. *(dissenting).* I join Justice Ann Walsh Bradley's excellent dissent.

¶112 I write separately on the substance of the order the court issued on August 12, 2016. The order denied Jeffrey C. Denny's (the defendant's) motion to strike Issue III of the State of Wisconsin's opening brief. My separate writing at that time stated I would be filing this writing.[1]

¶113 Let me set the background for this separate writing. The State petitioned the court for review, seeking reversal of the decision of the court of appeals. The court granted the State's petition.

¶114 The State filed its initial brief in this court. The defendant, Jeffrey Denny, moved to strike the third issue of the State's initial brief, i.e., whether this court's decision in State v. Moran, 2005 WI 115, 284 Wis. 2d 24, 700 N.W.2d 884, should be overruled. The court denied the motion on August 12,

_____

[1] I wrote as follows on the order dated August 12, 2016:

> I write to note my objections to the procedure followed in issuing this order and the substance of the order. Chief Justice Roggensack ordered the release of this order despite my request that it be held pending my completion of research and writing a dissent to be circulated at the beginning of this coming week. Issuing the order next week would not delay the oral argument of this case at the end of October. Justice Ann Walsh Bradley's vote was awaiting her reading my dissent. I thus note my objections at this time; a separate writing will follow.

I wrote my procedural objection in my writing on August 12, 2016. I now write my objection on the substance of the order denying the defendant's motion to strike.

1

2016, without explanation. I would have either granted the motion or denied the motion to strike part of the State's brief. In either event I would have advised the State it had erred in briefing the issue without seeking the court's consent to do so.

¶115 The rules of appellate practice support the defendant's motion. The rules of appellate practice do not support the court's order denying the defendant's motion without commenting on the rule of appellate practice involved.

¶116 I write because this is not the only case in which the court seems to be ignoring the rules of appellate practice. The litigants ought to know whether the court is adhering to its own rules of appellate practice, so they can determine whether they should adhere to the appellate practice rules.

¶117 The rules provide that a petition for review "must contain [a] statement of the issues the petitioner seeks to have reviewed . . . ." See Wis. Stat. (Rule) § 809.62(2)(a). Furthermore, the rules clearly state the consequences for failure of the petition for review to state an issue to be reviewed: "If a petition [for review] is granted, the parties cannot raise or argue issues not set forth in the petition unless ordered otherwise by the supreme court." See Wis. Stat. (Rule) § 809.62(6); Michael Heffernan, Appellate Practice and Procedure in Wisconsin § 23.8 D (6th ed. 2014); id., § 23.8 D (Supp. 23-1 Dec. 2015) ("Failure to raise an issue in the petition for review is deemed a waiver of any claim that the supreme court should consider the issue.").

¶118 Strict adherence to the statement of the issues in the petition for review is important for at least two reasons.

¶119 First, the statement of the issues in the petition for review gives notice to the other party to enable it to respond to the petition for review.

¶120 Second, the statement of the issues in the petition for review and the opposing party's response (and sometimes an amicus curiae filing) are the basis for the court's determining whether it will grant the petition to decide the issue(s) presented. If the court grants a petition for review, the court might accept all issues for review, might limit review to certain stated issues, or might add one or more issues for review.

¶121 With this procedure in mind, I turn to the State's petition for review in the instant case. It raised four issues.[2]

---

[2] The State's petition for review framed the four issues presented for review as follows:

1. Did the court of appeals misapply Moran when it held that a defendant seeking postconviction DNA testing of "relevant" evidence under Wis. Stat. § 974.07(2) need not demonstrate that the physical evidence "contains biological material or on which there is biological material" as provided under subparagraph 974.07(6)(a)2.?

2. In reviewing a motion for DNA testing at State expense under Wis. Stat. § 974.07(7)(a), must a circuit court always assume that a DNA test result will be exculpatory?

3. In assessing whether it is "reasonably probable" that a defendant would not have been convicted if exculpatory DNA results had been available,

(continued)

3

No issue sought the overruling of this court's decision in Moran. The petition for review refers to the interpretation and application of Moran in the instant case, not its overruling.

¶122 The State's brief in this court now raises three issues, one seeking the overruling of the Moran case.[3]

¶123 The order granting the State's petition for review (which was the court's standard order granting a petition for review) succinctly limited the issues to be briefed or argued by the State as follows: The State "may not raise or argue issues

---

should a circuit court apply a newly discovered evidence standard?

4. Did the circuit court erroneously exercise its discretion under Wis. Stat. § 974.07(7)(a) when it found that the jury would have convicted Denny even if exculpatory DNA results were present?

[3] The State's initial brief framed the three issues presented as follows:

1. To obtain post-conviction DNA testing of evidence, must the movant show that the evidence "contains biological material" that "will be relevant to his prosecution," State v. Moran, 2005 WI 115, ¶¶3, 46, 284 Wis. 2d 24, 700 N.W.2d 884?

2. To obtain post-conviction DNA testing at state expense, must the movant also show that there is a "reasonable probability that a jury," considering exculpatory DNA results, "would have reasonable doubt as to the defendant's guilt," State v. McCallum, 208 Wis. 2d 463, 475, 561 N.W.2d 707 (1997)?

3. Should this court overrule State v. Moran, 2005 WI 115, 284 Wis. 2d 24, 700 N.W.2d 884?

4

not set forth in the petition for review unless otherwise ordered by the court."

¶124 It is not always easy to tell the difference between an issue, an argument, and a subsidiary issue.[4] A subsidiary issue is deemed to be included in the statement of an issue. Wis. Stat. § 809.62 (4)(a).

¶125 In the instant case it is easy to conclude that the request to overrule Moran is an issue, not an argument or a subsidiary issue. Requesting the court to overturn a prior decision has not been viewed by this court as an argument (when the petition for review seeks interpretation of the decision) and has not been viewed as subsidiary to the issue of interpreting and applying a prior court decision.

¶126 The State conceded in its initial brief that it did not raise the issue of overruling Moran in its petition for review. The State's brief at 41, n.11 states: "The Court may consider this argument [of overruling Moran] even though it was not expressly raised in the Petition for Review." In its reply to the defendant's motion to strike this argument, the State's defense was that the need to raise an issue in the petition for review is only a "general rule," "not a hard-and-fast rule" that bars briefing in every case. The State cites no case or other authority supporting its contention that the need to raise an issue in the petition for review is only a general rule that does not bar briefing in every case. I could find none.

---

[4] Michael Heffernan, Appellate Practice and Procedure in Wisconsin § 3.4 at 4 (6th ed. 2014; Supp. 3-2 Dec. 2015).

5

¶127 The State bases its right to brief the issue of overruling <u>Moran</u> on the court's discretion to consider issues not raised by the petition for review. The court does have the power to consider issues not raised by the petitioner.[5] But the court's power to consider issues not raised by the petitioner does not pass to the State (or any petitioner filing a petition for review) the right to brief issues it did not raise in its petition for review. If a petitioner wishes to raise a new issue, it must seek the court's consent. Michael Heffernan,

---

[5] If this court addresses an issue not raised by the parties, the court should give the parties an opportunity to tackle the issue. A defendant has a due process right to notice of issues to be resolved and to be heard in a meaningful way. <u>See, e.g.,</u> <u>Lankford v. Idaho</u>, 500 U.S. 110, 126 (1991) (notice of "issues to be resolved by the adversary process is a fundamental characteristic of fair procedure"); <u>California v. Trombetta</u>, 467 U.S. 479, 486 (1984) ("criminal prosecutions must comport with prevailing notions of fundamental fairness"); <u>Mullane v. Central Hanover Bank & Trust Co.</u>, 339 U.S. 306, 313 (1950) (due process requires that "adjudication be preceded by notice and opportunity for hearing appropriate to the nature of the case"); <u>City of Janesville v. CC Midwest, Inc.</u>, 2007 WI 93, ¶68, 302 Wis. 2d 599, 734 N.W.2d 428 (Bradley, J., concurring) ("The rule of law is generally best developed when issues are raised by the parties and then tested by the fire of adversarial briefs and oral arguments."); <u>Bloomer v. Gibson</u>, 912 A.2d 424, 433-34 (Vt. 2006) ("The opportunity to present arguments on the legal issue upon which a case is to be decided is fundamental to sound legal process . . . .") (citing Adam A. Milani & Michael R. Smith, <u>Playing God: A Critical Look at Sua Sponte Decisions by Appellate Courts</u>, 69 Tenn. L. Rev. 245 (2002).

<u>Appellate Practice and Procedure in Wisconsin</u> § 23.14 at 17 (6th ed. 2014).[6]

¶128 In sum, adhering to the rules of appellate practice and procedure, I would have either granted the motion to strike or denied the motion to strike but advised the State it had erred in briefing the issue without seeking the court's consent to do so.

¶129 Fortunately, the defendant in the instant case had an opportunity to respond to the State's challenge to the <u>Moran</u> case. The first issue the defendant addressed in its brief was whether the court should abandon the court's unanimous "plain language" reading of Wis. Stat. § 974.07 in <u>Moran</u>.

¶130 I join Justice Ann Walsh Bradley's dissent, and for the reasons set forth I write separately on an issue Justice Ann Walsh Bradley's dissent does not address.

---

[6] In a recent case, <u>Coyne v. Walker</u>, 2016 WI 38, 368 Wis. 2d 444, 879 N.W.2d 520, the court recognized that an argument to overrule a prior decision raises a different issue than an argument relating to the interpretation and application of the prior case. The parties' briefs in <u>Coyne</u> argued about the interpretation and application of <u>Thompson v. Craney</u>, 199 Wis. 2d 674, 546 N.W.2d 123 (1996). The amicus brief in <u>Coyne</u> argued that the <u>Craney</u> case should be overruled. Because the court was going to consider this new issue raised by the amicus, the court allowed the parties to brief this new issue.

¶131 ANN WALSH BRADLEY, J. *(dissenting).* One of the essential tenets of our criminal justice system is that the "administration of justice is and should be a search for the truth." Garcia v. State, 73 Wis. 2d 651, 655, 245 N.W.2d 654 (1976). It is undisputed that DNA testing is "one of the most significant scientific advancements of our era" and the most powerful technology we have for revealing the truth. Maryland v. King, 133 S. Ct. 1958, 1966 (2013).

¶132 Making several missteps along the way, the majority limits the contours of this search. Dedicating almost half of its lengthy opinion to an exposition of the facts, it emphasizes the strong evidence of Denny's guilt as a reason to circumscribe his ability to conduct DNA testing. Of course there is strong evidence of guilt. Denny, as well as the multitude of convicted persons who have been exonerated after DNA testing, were all found guilty beyond a reasonable doubt.

¶133 The question is not whether there is strong evidence of guilt. Rather, the question is whether the legislature has written a statute that gives Denny the opportunity to test evidence that has the potential to exonerate him. More precisely, at issue in this case is whether Wisconsin's post-conviction DNA testing statute allows a defendant to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction.

¶134 This same question was answered eleven years ago, when this court unanimously determined that the plain meaning of the

1

post-conviction DNA testing statute "gives the defendant the right to test the sought-after evidence . . . ." _State v. Moran_, 2005 WI 115, ¶57, 284 Wis. 2d 24, 700 N.W.2d 884. Nothing in the DNA testing statute has changed in the decade since this court decided _Moran_, nor has the State presented any evidence that the statute has been unworkable in practice. The only thing that has changed is the composition of this court.

¶135 In reaching its conclusion, the _Moran_ court issued an invitation to the legislature. _See_ _id._, ¶56 ("We encourage the legislature to revisit Wis. Stat. § 974.07 . . . ."); _see also_ _id._, ¶59 (Wilcox, J. concurring) (" . . . I strongly urge the legislature to take a hard look at the practical consequences of [subsection (6)].").

¶136 The legislature did not respond to the invitation. Throwing caution (as well as any semblance of judicial restraint) to the wind, the majority steps in to perform the legislature's job.

¶137 It now overrules _Moran_ and runs roughshod over the fundamental doctrine of stare decisis. To justify overturning unanimous precedent, the majority unearths a heretofore unknown test which it labels "principles of policy." Majority op., ¶71. Apparently not very convinced of the legitimacy of its own discovery, the majority obscures the application of the new test by tucking it away in a footnote. _Id._, ¶70 n.16.

¶138 In overruling _Moran_, not only does the majority apply a test that courts have never before used, it also attempts to justify its action by relying on an "imagine[d]" purpose that

2

the legislature never stated. Garnering a trifecta of "nevers," it then embarks upon rewriting the plain meaning of Wis. Stat. § 974.07 by inserting a limitation that the legislature never created.

¶139 Ultimately, the majority arrives at a determination that pursuant to Wis. Stat. § 974.07(6), all Denny can do is look at evidence with the naked eye when its potential to exonerate him is invisible until it is tested. Id., ¶71. Such a useless procedure renders the majority's determination absurd.

¶140 The majority further missteps when it deprives Denny of the opportunity to test for potentially exculpatory evidence under an alternative statutory procedure. Whether analyzed under Wis. Stat. § 974.07(6) or (7), the majority impedes the search for the truth by erroneously limiting access to post-conviction DNA testing.

¶141 Contrary to the majority, I would adhere to this court's unanimous decision in Moran. The plain meaning of Wis. Stat. § 974.07(6) gives the defendant the right to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction. In the alternative, I conclude that Denny has met the requirements under Wis. Stat. § 974.07(7)(a) for post-conviction DNA testing.

¶142 Accordingly, I respectfully dissent.

I

¶143 This court follows the doctrine of stare decisis "scrupulously because of our abiding respect for the rule of

3

law." Johnson Controls Inc. v. Employers Ins. of Wausau, 2003 WI 208, ¶94, 264 Wis. 2d 60, 665 N.W.2d 257. A court's decision to depart from precedent is not to be made casually and we should not depart from precedent without sufficient justification. Id.

¶144 In this case "stare decisis carries enhanced force" because this court's decision in Moran interpreted a statute. See Kimble v. Marvel Ent., LLC, 135 S. Ct. 2401, 2409 (2015) (without "special justification," the decision to correct statutory interpretation should be left to the legislature); see also State v. Lynch, 2016 WI 66, ¶¶208-209, 371 Wis. 2d 1, 885 N.W.2d 1 (Ziegler, J., dissenting) ("[I]t is not alone sufficient that we would decide a case differently now than we did then. To reverse course, we require as well what we have termed a 'special justification'——over and above the belief "that the precedent was wrongly decided.") (quoting Kimble, 135 S. Ct. at 2409).

A

¶145 By overruling Moran, the majority disregards the fundamental principle of stare decisis and manufactures a heretofore unknown test for overturning precedent.

¶146 According to the majority, its decision to overrule Moran is justified because stare decisis is a "'principle of policy,' rather than an 'inexorable command.'" Majority op., ¶71 (citing Hohn v. United States, 524 U.S. 236, 251 (1998) (quoting Payne v. Tennessee, 501 U.S. 808, 828 (1991))). In Johnson Controls, this court explained what is meant by the

4

phrase "principle of policy." Stare decisis is a "principle of policy" because it is "a policy judgment that 'in most matters it is more important that the applicable rule of law be settled than that it be right.'" Johnson Controls, 264 Wis. 2d 60, ¶97.

¶147 In asserting that "sometimes stare decisis must yield to other important principles of policy," the majority blatantly mischaracterizes the law. Majority op., ¶71. It transposes the single stated "principle of policy" underlying stare decisis (that settled law is of the utmost importance), into an unknown and potentially unlimited number of "principles of policy" that could justify overruling precedent. What are these principles? Whose are they? Are they legislative policies or policies that this court develops as the need arises?

¶148 Further, the majority fails to meet its newly minted "principles of policy" test because it does not offer a compelling policy reason for overturning Moran. Indeed, the one policy the majority identifies is one it admits is "not dispositive in the case at issue . . . ." Id., ¶70 n.16.

¶149 Apparently not convinced about the legitimacy of its principle of policy, the majority tucks it away in a footnote——asserting that overruling Moran is "the best way to protect the rights and interests of crime victims in Wisconsin." Id., ¶70 n.16.

¶150 The majority's footnoted justification for overruling Moran is at odds with the rational offered by now-governor Scott Walker who co-authored this legislation. In an interview, then former state representative Scott Walker explained that post-

5

conviction DNA testing is focused on keeping us all safe——victims and the public alike:

> Whether it's proving someone's guilt or someone's innocence, in either case, it keeps us safer because if somebody is innocent, that means somebody who's guilty is still out there, and we can use that evidence to get them off the streets.[1]

¶151 Unsurprisingly, there is nothing in the record indicating that victims have suffered any more harm since Moran was decided. Faced with this void in the record, the majority resorts to imagination: "it is not difficult to imagine why such testing might cause significant distress to victims . . . ." Majority op., ¶70 n.16.

¶152 Based on this speculation, supported and advanced by its collective imagination, the majority divines a "principle of policy" in its attempt to justify overruling Moran. It concludes that upholding Moran "would be purposefully perpetuating a much more expansive postconviction forensic DNA testing regime than the legislature saw fit to enact, to the possible detriment of Wisconsin crime victims." Id., ¶70 n.16.

¶153 The rights and interests of crime victims are undeniably important considerations, which the legislature has already addressed through the notice provisions in Wis. Stat.

---

[1] Dee J. Hall, Nine people freed on strength of DNA testing in Wisconsin, WisconsinWatch.org, Dec. 13, 2009, http://wisconsinwatch.org/2009/12/nine-people-freed-on-strength-of-dna-testing-in-wisconsin/.

§ 974.07(4).[2] However, relying on an "imagined" policy reason to limit the availability of DNA testing strays too far from subsection (4)'s victim-notification mandate. See State ex rel. Kalal v. Cir. Ct. for Dane Cty., 2004 WI 58, ¶48, 271 Wis. 2d 633, 681 N.W.2d 110. There is nothing in the text of the statute that suggests the legislature intended to limit post-conviction DNA testing due to the speculative concerns the majority identifies here.

¶154 Contrary to the majority's assertions, allowing DNA testing does not undermine finality or lead to "the possibility of 'inequitable results'" due to "open[ing] up cases that have long been thought by everyone, including crime victims, to be final." Majority op., ¶70 n.16 (citation omitted). Performing DNA testing on relevant evidence is only the first step in a process where the defendant must next demonstrate that the results of the testing support his claim. See Moran, 284 Wis. 2d 24, ¶47 (allowing DNA testing does not guarantee a new trial or even an evidentiary hearing).

¶155 If the DNA test results do not support a defendant's claim, the case is not reopened. And if the DNA testing results do support a defendant's claim of innocence, victims will have little interest in finality if the true criminal perpetrator is still at large. See majority op., ¶70 n.16.

---

[2] Pursuant to Wis. Stat. § 974.07(4)(a), if a motion for post-conviction DNA testing is made under sub. (2), the circuit court shall send a copy of the motion to the victim. Likewise, if a hearing on the motion is scheduled, a notice of the hearing shall be sent to the victim. Wis. Stat. § 974.07(4)(a).

7

¶156 Likewise, there is no evidence that post-conviction DNA testing has lead to "inequitable results." If the majority intends to speculate that post-conviction DNA testing might lead to the "possibility" of wrongfully exonerating a criminal defendant, it has a very steep hill to climb. The State has introduced no evidence that legitimate convictions have been overturned. Additionally, courts have widely acknowledged that DNA testing is unparalleled in its ability to exonerate the wrongly convicted and identify the guilty. Maryland v. King, 133 S. Ct. at 1966.

B

¶157 Turning away from the majority's newly created "principles of policy" test and instead considering the well-established criteria this court has always applied in determining whether it may overrule precedent, it becomes clear why the majority saw the need to create a new test justifying its decision. This case satisfies none of the well-established criteria that would warrant departing from the doctrine of stare decisis and overruling Moran.

¶158 In Johnson Controls, we identified several criteria in Wisconsin for overruling our prior cases: (1) if "changes or developments in the law have undermined the rationale behind a decision"; (2) "there is a need to make a decision correspond to newly ascertained facts"; or (3) "there is a showing that the precedent has become detrimental to coherence and consistency in the law." 264 Wis. 2d 60, ¶98. We explained further that other "relevant considerations in determining whether to depart from

8

stare decisis are whether the prior decision is unsound in principle, whether it is unworkable in practice, and whether reliance interests are implicated." Id., ¶99.

¶159 Addressing the first two factors, the majority argues that the Moran court did not consider Wis. Stat. § 974.07(12) in reaching its analysis. Majority op., ¶70 (citing Johnson Controls, 264 Wis. 2d 60, ¶98). According to the majority, "[r]econsideration of the statute with the benefit of a clear understanding of [subsection (12)] convinces us that our interpretation of sub. (6) must be modified to take account of sub. (12)." Id.

¶160 The majority's analysis suffers from a glaring mistake. Subsection (12) was a part of the statute at the time Moran was decided and has not been changed in the interim. Although the majority may place a different emphasis on subsection (12) than did the Moran court, it would be meaningless to require "changes or developments in the law" if those changes originate from only this decision. Likewise, there are no newly ascertained facts in this case aside from the majority's new interpretation of the statute.

¶161 Equally flawed are the majority's unsubstantiated claims that Moran's interpretation of Wis. Stat. § 974.07(6) has "become detrimental to coherence and consistency in the law," that it has rendered "the rest of the statute incoherent in a manner we obviously did not contemplate in Moran," and that it is "unsound in principle." Id. (citing Johnson Controls, 264 Wis. 2d 60, ¶¶98-99).

9

¶162 The sole justification the majority offers here is that "allowing testing under sub. (6) would require only the barest of showings." Id., ¶66. According to the majority, it is "difficult to believe that the statute is most properly read to permit convicted offenders who are unable to meet the surmountable sub. (7) standard to engage in postconviction fishing expeditions in attempts to cast doubt upon and upset those convictions." Id.

¶163 The majority's prospective concerns carry little weight when there is no evidence that Moran's interpretation of the statute has lead to frivolous requests for testing over the last decade. Indeed, the State has offered no evidence that it has been overwhelmed by demands for post-conviction DNA testing or that legitimate convictions have been overturned.

¶164 At oral argument, Denny's counsel explained that the Wisconsin Innocence Project "probably does the vast majority, if not almost all of the post-conviction DNA testing in this State."[3] Counsel affirmed that there are very few post-conviction motions for DNA testing filed each year, explaining that "we're talking about a handful of cases each year. There's no overwhelming burden on the system. It's a handful of cases."

---

[3] The Wisconsin Innocence Project (WIP) is a clinical legal education program that is part of the Frank J. Remington Center at the University of Wisconsin Law School. It seeks to "exonerate the innocent, educate students, and reform the criminal justice system by identifying and remedying the causes of wrongful convictions." Wisconsin Innocence Project, University of Wisconsin Law School, http://law.wisc.edu/fjr/clinicals/ip/index.html.

¶165 Contrary to the majority's assertions, there is no evidence that Moran's interpretation of the post-conviction DNA testing statute is incoherent or inconsistent in ways that have become detrimental to the law. In fact, it appears that the current statutory scheme has worked well for both defendants and the State.

¶166 Post-conviction DNA testing pursuant to subsection (6) avoids litigation and saves judicial resources because a defendant does not need a court order to test evidence. Additionally, it saves the State the cost of paying for the testing and relieves the State from having to acknowledge that the defendant has met the reasonably probable standard set forth in Wis. Stat. § 974.07.

¶167 Given the legal and logical gymnastics the majority performs in order to justify overruling Moran, one would hope that its decision at least advances a sound interpretation of the statute. Unfortunately, such hope is unrealized.

II

¶168 By rewriting Wis. Stat. § 974.07, the majority inserts a limitation the legislature never created and arrives at an unreasonable and absurd result.

¶169 In Moran, this court determined that if a defendant met the threshold requirements set forth in Wis. Stat. § 974.07(2), he had two avenues for pursuing post-conviction DNA testing.[4]   284 Wis. 2d 24, ¶55.   Moran explained that "the

---

[4] Wis. Stat. § 974.07(2) provides in relevant part that a defendant may bring a motion for an order requiring DNA testing
(continued)

11

statutory text makes clear that subsections (6) and (7) are intended for different purposes." Id. Subsection (6) allows a defendant access to test results and evidence containing biological material, but he must decide whether to test the material and pay for the testing himself.[5] Id. Subsection (7) pertains to court-ordered testing at the State's expense. Id.[6]

---

if the evidence: (a) is relevant to the investigation or prosecution that resulted in the conviction; (b) is in the actual or constructive possession of a government agency; and (c) has not been previously subject to DNA testing or, if it has been previously tested, it may now be tested again using a technique not previously available or utilized and that provides a reasonable likelihood of more accurate and probative results.

[5] Wis. Stat. § 974.07(6)(a) provides in relevant part:

(6)(a) Upon demand the district attorney shall disclose to the movant or his or her attorney whether biological material has been tested and shall make available to the movant or his or her attorney the following material:

. . .

2. Physical evidence that is in the actual or constructive possession of a government agency and that contains biological material or on which there is biological materials.

[6] Wis. Stat. § 974.07(7)(a) provides in relevant part:

A court in which a motion under sub. (2) is filed shall order forensic deoxyribonucleic acid testing if all of the following apply:

1. The movant claims that he or she is innocent of the offense at issue in the motion under sub. (2).

2. It is reasonably probable that the movant would not have been prosecuted [or] convicted . . . if exculpatory deoxyribonucleic acid

(continued)

12

¶170 The majority does not dispute that "it is possible to read § 974.07 as creating two systems for testing at private expense (under subs. (6) and (12)) and one system for testing at public expense (under sub. (12)) . . . " Majority op., ¶67.[7] However, it overrules <u>Moran</u> because "we do not find this to be the most sensible interpretation of the statute." <u>Id.</u>

¶171 Contrary to <u>Moran</u>, the majority now concludes that all motions for post-conviction DNA testing must proceed by court-order under Wis. Stat. § 974.07(7). <u>Id.</u>, ¶68. Additionally, the majority determines that Wis. Stat. § 974.07(6) allows a defendant with only the naked eye to look at, but not test, relevant evidence containing biological material. <u>Id.</u>

---

testing results had been available before the prosecution [or] conviction . . .

Wis. Stat. § 974.07(7)(b) provides in relevant part:
A court in which a motion under sub. (2) is filed may order forensic deoxyribonucleic acid testing if all of the following apply:

1. It is reasonably probable that the outcome of the proceedings that resulted in the conviction . . . would have been more favorable to the movant if the results of deoxyribonucleic acid testing had been available before he or she was prosecuted [or] convicted . . .

[7] The payment of costs for post-conviction DNA testing are set forth in Wis. Stat. § 974.07(12). Subsection 12(a) provides that a court "may order a movant to pay the costs of any testing ordered by the court under this section if the court determines that the movant is not indigent." Subsection (12)(c) provides that "[t]he state crime laboratories shall pay for testing ordered under this section . . . if the court does not order the movant to pay for testing."

13

¶172 Not only are the majority's complaints about <u>Moran</u> unpersuasive,[8] its analysis violates a basic premise that it is the legislature that writes the statutes——not the courts. The majority usurps the legislature's role when it writes its own inspection limitation into subsection (6) that prohibits DNA testing of evidence.[9]

---

[8] The majority asserts that <u>Moran</u> erred in its statutory interpretation because:

- Subsection (6) says nothing about allowing the movant to conduct forensic testing or sending the evidence away for testing. Majority op., ¶64.

- <u>Moran</u> did not discuss subsection (12). <u>Id.</u>, ¶67.

- Subsection (6) does not reference testing by "court order" like other subsections in the statute. <u>Id.</u>, ¶68.

Each of these points are easily rebutted:

- Even the majority acknowledges that "sub. (6) does not explicitly prohibit a movant from testing evidence, either." <u>Id.</u>, ¶64.

- <u>Moran</u> harmonized subsection (12) with subsections (6) and (7) when it determined that one provided for private payment of costs and the other provided for public payment of costs. <u>See</u> 284 Wis. 2d 24, ¶57.

- There is no reason why DNA testing must proceed by court-order unless the court is ordering the State to conduct and pay for the costs of that testing.

[9] Not only does the majority fail to exercise deference to the legislature, its decision in this case is out of step with the legislature's commitment to utilizing DNA testing. For example, the legislature recently enacted 2013 Wis. Act 20, which expanded the collection, analysis, and maintenance of DNA samples as part of a larger initiative to expand the State's DNA databank. <u>See, e.g.,</u> Wis. Stat. § 165.77(2)(a)1&3 (setting forth the requirement that the DOJ provide for the analysis of collected samples and maintain a state DNA databank).

14

¶173 In contrast, the Moran court explicitly declined to "add language to the statute in order to justify the State's interpretation." Moran, 284 Wis. 2d 24, ¶39. After careful analysis, the Moran court determined that "[w]e are unable to discern from the plain language of § 974.07 a clear legislative intent to block testing demanded by a person willing and able to pay until that person satisfies the requirements for publicly funded DNA testing." Id., ¶54.

¶174 Additionally, the majority violates a well-established canon of statutory construction that we interpret statutes "reasonably, to avoid absurd or unreasonable results." Kalal, 271 Wis. 2d 633, ¶46. The majority's interpretation of the statute, unlike the interpretation set forth in Moran, leads to an absurd and unreasonable result because without DNA testing, the ability only to look at evidence containing biological material is essentially useless.

¶175 Apparently recognizing this fundamental flaw in its reasoning, the majority asserts that "the facts in the case at issue demonstrate why inspection is useful." Majority op., ¶71 n.17. It then explains that in his supplemental motion for post-conviction DNA testing, Denny reviewed the physical evidence on file and identified additional relevant items that were previously overlooked. Id. Thus, according to the majority, "the ability to inspect allows one to ascertain what, if any, testing should be sought." Id.

¶176 Contrary to the majority's explanation, the facts of this case demonstrate the futility of examining evidence without

15

being able to test it. Although Denny identified additional relevant items that were overlooked, there is nothing he can do with that evidence.

¶177 According to the majority, he can no longer test the evidence at his own expense pursuant to subsection (6) and the majority has denied his claim for court-ordered testing pursuant to subsection (7). All Denny can do is look at the evidence when its potential to exonerate him is invisible until it is tested. This is an absurd and unreasonable result that contravenes the plain language of the statute.

III

¶178 Finally, I address the majority's conclusion that Denny's motion for post-conviction testing does not entitle him to court-ordered testing pursuant to Wis. Stat. § 974.07(7)(a)2. According to the majority, Denny has failed to meet the reasonably probable standard. It determines that "[e]ven if exculpatory DNA testing results were available before prosecution and conviction, we are unable to conclude that it is reasonably probable that Denny would not have been prosecuted or convicted because of his crime." Id., ¶81.

¶179 The majority begins by correctly stating that for the purposes of this analysis, we are to assume that if DNA testing were to occur, the results would be exculpatory. Id., ¶76. It errs, however, when it denies Denny the opportunity to test potentially exculpatory evidence by failing to acknowledge how the witness testimony could be undermined by exonerating DNA-evidence.

16

¶180 Rather than analyze the testimony against Denny in the context of exculpatory physical evidence, the majority rests its analysis on the broad assertion that "[t]he evidence incriminating Denny was, to put it mildly, extensive." Id., ¶77; see also id., ¶81 (citing State v. Denny, 2016 WI App 27, ¶86, 368 Wis. 2d 363 (Hagedorn, J., concurring in part and dissenting in part) ("As put by the separate writing below, '[t]he evidence was vast, overwhelming, and damning. It was not even close.'")).

¶181 Although the majority opinion begins with an expansive exposition of facts, its analysis relies on a brief summary of the conflicting testimony of multiple unreliable witnesses in denying Denny's motion for testing. According to the majority, "[t]estimony indicated that Denny confessed, made inculpatory statements to, and took inculpatory actions in front of, multiple witnesses." Id., ¶77.

¶182 The majority's reliance on the "extensive" and "overwhelming" evidence presented against Denny is misplaced. It ignores the reality that by definition his conviction was premised on strong evidence of guilt. Denny, like all convicted persons who have been exonerated after DNA testing, was found guilty beyond a reasonable doubt. Additionally, the majority ignores the ways that witness testimony is undermined by exonerating DNA-evidence.

¶183 Denny argues that three types of DNA test results would create a reasonable probability of a different result: (1) DNA that matches a convicted offender; (2) DNA that excludes

17

Denny and his brother Kent on all items; or DNA on multiple items matching the same unknown third party ("redundant DNA").

¶184 The majority dispenses with a DNA result that matches a convicted offender or multiple items matching the same unknown third party by agreeing with the circuit court that "Mohr's killing has never been presented as a single-perpetrator crime . . . " Id., ¶78. Although this is true, the vast majority of the evidence against Denny was testimony in which Denny and Kent were the only perpetrators. In a handful of accounts, an individual named Leatherman was also implicated.

¶185 Contrary to the majority's assertion, DNA evidence matching an unknown third party or a convicted offender would undermine every piece of testimony in which Denny and Kent were presented as the only two perpetrators of the crime. The majority does not acknowledge this possibility. Instead it speculates that if more than one person committed the crime, finding a third person's DNA could not change the result because any number of people could have committed the crime in addition to Kent and Denny.

¶186 Further, the majority contends that the absence of DNA belonging to Denny and Kent would not be "particularly compelling." Id., ¶78. The majority dismisses the effect of exculpatory evidence excluding both Denny and Kent because there was no single account of what transpired in this case and various inconsistencies among the accounts of the witnesses. As discussed above, however, Denny and Kent were implicated in every account of the crime.

18

¶187 Excluding both brothers would undermine all of the testimony introduced against Denny in which both brothers played a role in the crime. Given the obvious struggle and the violent crime scene in which evidence containing DNA was spread throughout the bedroom and into the hallway, it is reasonably probable that the result at trial would have been different if there was no physical evidence connecting Denny and Kent to the crime.

¶188 The majority even contends that the "various inconsistencies between the accounts of the witnesses actually serves to insulate Denny's conviction." Id., ¶78. This strains credulity, given the fact that the witnesses were unreliable in various ways, admitting to drug and alcohol use at relevant times and given grants of immunity so that they would testify. Rather than weigh the effect of exculpatory DNA evidence against this unreliable testimony, the majority contends that it is not persuaded by this argument because the jury was not. Id., ¶80. This ignores the essential fact that the jury, in weighing the testimony of the witnesses, was not presented with exculpatory DNA evidence.

¶189 Ultimately, the majority's summary of conflicting testimony does not support its conclusion. Given the various inconsistencies in the testimony from unreliable witnesses, it is reasonably probable that exculpatory DNA results would have lead to a different outcome.

IV

¶190 In sum, the majority opinion offers no persuasive legal, logical or factual reason for its decision to overrule

19

<u>Moran</u>. Instead it discards the doctrine of stare decisis, unearths a test never before used to justify overruling precedent, "imagine[s]" a statutory purpose, rewrites the statute and ultimately ends with an absurd result. And for what?

¶191 As we learned at oral argument, only a handful of motions for post-conviction DNA testing are filed each year. But for the handful of potentially innocent people, the majority's decision limiting access to post-conviction DNA testing is devastating.

¶192 Daryl Dwayne Holloway's recent exoneration provides a compelling example of how Moran's interpretation of the statute worked well in practice for both the State and defendants. On October 5, 2016, three weeks before oral argument in this case, Holloway was exonerated based on new DNA evidence after spending 24 years in prison. At the request of counsel, the State reviewed the evidence against Holloway and agreed to DNA testing pursuant to Wis. Stat. § 974.04(6)(a). "In collaboration with the District Attorney's Office, the Wisconsin Innocence Project had new DNA testing done." The testing results exonerated Holloway and "[t]he Milwaukee District Attorney's office and the Wisconsin Innocence Project drafted a stipulation agreeing that Holloway's conviction should be vacated . . . ."[10]

¶193 The prosecutors were praised for taking on the case and serving as "ministers of justice, not just advocate[s] for

[10] Innocence Project, Daryl Dwayne Holloway, http://www.innocenceproject.org/cases/daryl-dwayne-holloway/.

convictions."[11]  Given the majority's approach, no such accolades are deserved here.

¶194 If the majority opinion were the law when prior exonerees sought post-conviction DNA testing, who knows if some would still be serving time in prison for crimes they never committed.  Rather than retaining an established statutory pathway enabling a search for the truth, the majority blocks it and provides yet another avenue for sustaining convictions——even potentially wrongful convictions.

¶195 Before a jury begins its deliberations, the circuit judge instructs:  "Let you verdict speak the truth, whatever the truth may be."  Such an instruction falls on the deaf ears of the majority.  By erroneously limiting access to post-conviction DNA testing, it impedes the criminal justice system's search for truth.

¶196 Contrary to the majority, I would adhere to this court's unanimous decision in <u>Moran</u>.  The plain meaning of Wis. Stat. § 974.07(6) gives the defendant the right to test, at his own expense, evidence containing biological material that is relevant to the investigation or prosecution that resulted in his conviction.  Additionally, the majority errs when it denies Denny the opportunity to test potentially exculpatory evidence by failing to acknowledge how the witness testimony could be undermined by exonerating DNA-evidence.

---

[11] Ashley Luthern, <u>Milwaukee man exonerated by DNA after 24 years in prison</u>, Milwaukee Journal Sentinel, Oct. 5, 2016, http://www.jsonline.com/story/news/crime/2016/10/05/milwaukee-man-exonerated-dna-after-24-years-prison/91615854/.

¶197 Accordingly, I respectfully dissent.

¶198 I am authorized to state that SHIRLEY S. ABRAHAMSON joins this dissent.