PER CURIAM.
¶1 Roy A. Whitelow appeals from a judgment of conviction entered after a jury found him guilty of first-degree reckless homicide and from an order denying his postconviction motion for a new trial. Whitelow maintains that he is entitled to a new trial based on trial counsel's ineffective assistance and because the circuit court erred in denying his motion for a mistrial. He further asserts that the circuit court improperly denied his WIS. STAT . § 974.07 (2015-16)[1] request for postconviction DNA testing at public expense. For the reasons that follow, we affirm.
¶2 The victim, Heather Fugate, lived with her husband, her brother, A.G., and her young daughter. A.G. testified that his sister had an ongoing problem with opiates and would lie and steal to support her habit. On Monday, February 11, 2013, Heather took her daughter to school and was gone for an unusually long time. Heather returned and gave A.G. a line of heroin. A.G. and Heather's husband testified that she was using drugs throughout the evening. The next morning, Tuesday, February 12, 2013, Heather asked A.G. to take her daughter to school. She was in the bathroom when he left. A.G. was gone about ten minutes. Upon returning home, he found Heather unresponsive in the bathroom and called emergency services. Heather was pronounced dead at the scene. Her cause of death was determined to be a heroin overdose.
¶3 Investigating officers learned that Heather had been in contact with a drug dealer nicknamed "Blu." The officers sent him text messages pretending to be Heather and arranged to meet at a local gas station. Whitelow, who turned out to be "Blu," arrived at the gas station and was arrested. He was charged with one count of first-degree reckless homicide by delivery of a schedule I or II controlled substance.[2] Whitelow pled not guilty, and the case proceeded to a jury trial.
¶4 Heather's friend, Amanda Vargas, testified that Heather came to her home on February 9, 2013, looking for opiates, and was there when Whitelow arrived to sell heroin to another friend, Nicole Finch. Vargas told police that Whitelow packaged his heroin in $20.00 amounts in small baggie corners that he carried in a blue lighter. Whitelow sold heroin to Finch, and Finch sold some to Heather. Vargas and Finch learned that Heather arranged to buy heroin directly from Whitelow, resulting in an angry text message exchange. Witness Andrea Slominski confirmed that on Sunday, February 10, 2013, Heather said she was getting heroin from a man she met at Vargas's house.
¶5 Officers retrieved text messages from phones found in Heather's home and in Whitelow's possession. The logs were introduced into evidence. Messages sent and received from Heather's phone showed that on the weekend of February 9, 2013, Heather was in contact with Vargas in an effort to buy opiates. The messages showed that Vargas and Heather argued about Heather directly contacting Whitelow to buy heroin behind Vargas's and Finch's backs. The messages also showed Heather making plans with Whitelow over the course of the weekend. Heather told Whitelow, and motel records confirmed, that she rented a room on Sunday, February 10, 2013. Heather gave Whitelow her name and room number so he could get a key. Motel records showed a photo I.D. of Whitelow that had been used to obtain the room key on February 10.
¶6 Among the items seized from the scene were a resealable zipper plastic storage bag and a fold-over plastic storage bag. The zipper and fold-over bags were swabbed but did not produce enough DNA for testing. The fold-over bag contained seven unopened baggie corners full of a "gray chunky solid material" that turned out to be heroin. The crime lab found DNA from three or more people on the seven baggies. At least one of the contributors was a female and Heather was excluded as a source. Whitelow was included as a possible contributor to the DNA, and the lab tech said that the probability of randomly selecting an individual unrelated to Whitelow who could have contributed to the mixed profile was about 1 in 2000.
¶7 The zipper bag contained a tinfoil square, two cotton swab heads, and about twenty-nine opened and empty baggie corners. The detective who sent the evidence to the crime lab testified that he did not send the twenty-nine corners or the tinfoil to the lab because in his experience, containers that have been opened are often contaminated.
¶8 The State introduced recorded jail phone calls where Whitelow asks someone to "get the motherfucking car [that had been impounded when he was arrested] ... I don't care about nothing else." He told the same person to "go home, right now, and "get rid of" a cell phone at the house. On a later date, he told the same person to get rid of the "blue Bic lighter" and to "flush" what was "in it," and to get rid of all of the things in the car. Whitelow chose not to testify.
¶9 In closing argument, the parties disputed how to interpret the final texts between Heather and Whitelow. On Monday, February 11, 2013, at around 8:04 a.m., Heather sent texts to Whitelow stating she was dropping her daughter at school and would then be on her way to Whitelow. She said: "I got my people that r gonna follow but park at [another location] a few places down so they don't know where I'm goin. I need u to have wat u got left ready baby cuz my key not gonna work." A short time later, Whitelow started a series of texts asking Heather where she was, asking her to text back, and saying things like "I need my stuff gotta go." The prosecution's theory was that after bringing her daughter to school, Heather obtained heroin from Whitelow under the pretense that she was about to sell it to buyers who had followed her and parked down the street. Rather than returning with the money or heroin, Heather disappeared and never again responded to Whitelow's texts.
¶10 The defense argued that the texts tended to show that Heather had not seen Whitelow since Sunday or sometime before, and that she did not show up to see him on Monday. The defense pointed to the casual tone of Whitelow's Monday morning texts where he said things like "I guess I'll see u another time, gotta go." The defense argued that Whitelow's texts implying that Heather stole from him suggested that she had stolen the heroin at an earlier date, perhaps from the motel room. By pointing to the lack of direct proof that Heather actually met with Whitelow on Monday, February 11, the defense was able to argue that any heroin Heather obtained from Whitelow was stolen and/or used up by the time of her overdose on Tuesday morning. Therefore, Whitelow did not deliver the dose of heroin that killed Heather, either because she stole it or because the fatal dose was obtained after her last contact with Whitelow, from someone else.
¶11 During deliberations, the court was informed that Juror N read a recent newspaper article about the trial and shared information about Whitelow's potential maximum sentence with the other panel members. After considerable discussion with the attorneys, the court conducted a colloquy with Juror N about her partiality and ability to follow the court's instructions, and with the rest of the jurors to determine their ability to remain fair and impartial. The circuit court ultimately denied Whitelow's motions to strike the panel and for a mistrial, and allowed deliberations to continue. The jury found Whitelow guilty.
¶12 Whitelow filed a motion for postconviction discovery seeking DNA testing on any baggies and tinfoil not yet tested for DNA. Whitelow claimed that the mixed DNA profile found on the seven knots of heroin, along with the semen collected during Heather's autopsy that did not match Whitelow's DNA, would support a third-party defense. He also claimed that the potential test results would support an ineffective assistance of counsel claim for trial counsel's failure to investigate this line of defense.
¶13 At a hearing on the motion, the circuit court determined that Whitelow was not entitled to have the items tested at public expense, but could test them at private expense. Whitelow moved for reconsideration, attaching an email from the State Public Defender's Office explaining that there is no SPD budget for DNA testing. The circuit court denied reconsideration.
¶14 Whitelow then filed a postconviction motion alleging he was entitled to a new trial due to the ineffective assistance of trial counsel. The motion alleged that trial counsel was ineffective for failing to (1) seek pretrial DNA testing, (2) investigate and argue the significance of the color of the heroin seized as evidence, and (3) call Anthony Lewis as a witness. The circuit court denied the motion without an evidentiary hearing. Whitelow appeals.
The Circuit Court Properly Denied Whitelow's Postconviction Motion Alleging the Ineffective Assistance of Trial Counsel Without Holding an Evidentiary Hearing.
¶15 Whitelow maintains that he received ineffective assistance because trial counsel (1) failed to seek DNA testing of the tinfoil square and twenty-nine opened baggie corners found in the zipper storage bag; (2) failed to argue that he dealt only brown heroin, not the gray heroin found with the victim; and (3) failed to call a witness to testify that the victim actually stole the heroin from Whitelow and Whitelow did not "deliver" it. We conclude that the circuit court properly denied Whitelow's postconviction motion without a hearing because his allegations, even if true, fail to set forth any viable ineffective assistance of counsel claim.
¶16 To prevail on an ineffective assistance of counsel claim, the defendant must show that counsel's actions or inaction constituted deficient performance which caused prejudice. Strickland v. Washington , 466 U.S. 668, 687 (1984) ; State v. Love , 2005 WI 116, ¶30, 284 Wis. 2d 111, 700 N.W.2d 62. "To prove constitutional deficiency, the defendant must establish that counsel's conduct" fell "below an objective standard of reasonableness." Love , 284 Wis. 2d 111, ¶30. To prove constitutional prejudice, the defendant must show that but for counsel's unprofessional errors a reasonable probability exists that the result of the proceeding would have been different. Id .
¶17 A defendant who alleges ineffective assistance of counsel is not automatically entitled to an evidentiary hearing. State v. Bentley , 201 Wis. 2d 303, 310-11, 548 N.W.2d 50 (1996). If the factual allegations of the motion are insufficient or conclusory, or if the record irrefutably demonstrates that the defendant is not entitled to relief, the circuit court may, in its discretion, deny the motion without a hearing. Id. at 309-10.
¶18 Whitelow first claims that trial counsel provided ineffective assistance by failing to seek DNA testing of the tinfoil and the approximately twenty-nine baggie pieces found in the zipper storage bag. His theory is that the presence of another person's DNA on those items would cast doubt on his convictions. We disagree. The presence of a third person's DNA on the baggies would not negate the overwhelming, corroborated evidence showing that Whitelow was Heather's exclusive source of heroin between February 10 and her death on February 12. The text messages between Heather, Vargas, Finch, Slominski, and Whitelow show that the only person providing heroin to any of that group was Whitelow, and that Heather and Whitelow planned to meet so that she could buy heroin. Whitelow was a possible contributor to the DNA profile on the seven bags of heroin found with Heather. The lab tech testified that the DNA found on those bags came from a mixture of three or more people. Finding a third party's DNA on the other baggies would have proved nothing more than that like the baggies already tested, they were touched by some third party
¶19 Whitelow asserts that trial counsel's failure to seek additional testing was prejudicial because Heather's autopsy revealed the presence of semen, and DNA testing excluded Whitelow as the source. He then speculates that the semen's source was "not likely" Heather's husband but rather an "opiate-dealing male" who supplied the fatal dose of heroin. We are not remotely persuaded. There is no evidence in the record that Heather was involved, as Whitelow asserts, in "an ongoing drug-for-sex scheme" or that this other "opiate-dealing male" exists. The evidence of record shows that the only "opiate-dealing male" with whom Heather had any involvement that weekend was Whitelow. That she engaged in sexual activity with someone other than Whitelow sometime in the five days before her death is irrelevant to this case. "The defendant must affirmatively prove prejudice; mere speculation is insufficient." State v. Adams , 221 Wis. 2d 1, 13, 584 N.W.2d 695 (Ct. App. 1998). Whitelow's theory is wildly speculative and falls far short of demonstrating that the outcome of his trial would have been different had trial counsel requested testing of the additional baggies.
¶20 Nor is Whitelow entitled to a hearing on his claim that trial counsel was ineffective for failing to argue about the gray color of the heroin found with Heather. Here, Whitelow attempts to capitalize on A.G.'s testimony that Heather left him a line of brownish-white powder on Monday morning. Whitelow avers that he only sold "brown" heroin and that he thought trial counsel would "use this information at trial to prove Heather had used (and shared with her brother) my brown heroin on Monday and overdosed Tuesday on the gray heroin." He claims that this argument "was ignored by counsel for no strategic reason."
¶21 We agree with the State that there is an obvious strategic reason that counsel would not make this argument: it would definitively place Whitelow's heroin in Heather's hands the day before she died and would have asked the jury to conclude that Heather met with some unidentified drug dealer between Monday evening and Tuesday morning, a dealer she did not bother to text or call despite her near-constant stream of weekend messages to her husband, to Vargas, and to Whitelow. This argument would have been patently incredible in light of the timeline and the text messages. Counsel is not deficient for failing to make meritless arguments. State v. Wheat , 2002 WI App 153, ¶23, 256 Wis. 2d 270, 647 N.W.2d 441. Additionally, aside from Whitelow's self-serving postconviction assertion, there was no evidence in the record that he possessed only brown heroin, or that Heather died from gray heroin. Further, even assuming there was some evidence to substantiate this theory and that Whitelow actually shared it with trial counsel, "[t]here are countless ways to provide effective assistance in any given case." Strickland , 466 U.S. at 689. Whitelow has not shown how his trial attorney's decision not to argue about the heroin's color fell below an objective standard of reasonableness.
¶22 Nor does Whitelow's motion show prejudice sufficient to require an evidentiary hearing. There was a substantial amount of evidence showing that Whitelow was delivering heroin to Heather over the weekend, and no evidence that she was in contact with any other drug dealer. The seven bags of gray heroin found with Heather were packaged exactly how Vargas and Finch described Whitelow's packaging, and he was a possible contributor to DNA found on the bags. There was a plethora of text messages showing that Heather was obtaining heroin from Whitelow. There is no reasonable probability that the jury would have acquitted Whitelow had trial counsel argued that he only had brown heroin.
¶23 Whitelow's final ineffective assistance claim alleges that trial counsel deficiently failed to call his cousin, Anthony Lewis, as a witness. Nicole Finch told police that someone had accompanied Whitelow to Vargas's house on Sunday, February 10. That person was Lewis. Whitelow now claims that Lewis would have corroborated a claim that Heather stole Whitelow's heroin from the motel room on Monday morning, and that is how it came to be in her possession. Attached to Whitelow's postconviction motion was an affidavit from Lewis averring that he moved to Tennessee after Whitelow's arrest. Whitelow's affidavit avers that his trial counsel tried but was unable to find Lewis and that Whitelow "later found out he moved to Tennessee." Whitelow's assertions, if true, do not demonstrate ineffective assistance. Trial counsel's attempts to find Lewis are the actions of a reasonably prudent attorney. That her actions were ultimately unsuccessful does not render them deficient.
The circuit court properly exercised its discretion in denying Whitelow's motion for a mistrial.
¶24 During deliberations, the circuit court was informed that Juror N had shared with the other panel members information from a newspaper about Whitelow's maximum sentence. After retrieving a copy of the article, the parties agreed to research the issue and address it the next day.
¶25 The next morning, during an individual colloquy outside the other jurors' presence, Juror N explained that she knew jurors were not supposed to read outside information, but that the newspaper was sitting out when she arrived home and she read the article before realizing its relevance. The court asked what she shared with the other jurors, to which she replied: "One of the jurors asked how many years that Whitelow would get if he went to prison and I just said 30 years maybe." She said that someone asked how she knew that information and she said she read it in the paper. The circuit court determined she did not intentionally seek out the article or disregard the court's admonishment. Juror N assured the court she could set aside the extraneous information and decide the case fairly and impartially on the evidence presented.
¶26 The court then brought in the rest of the jury and explained why sentencing is not relevant to the jury's charge. It also told them that the newspaper article contained inaccurate information. The court then sent the jury back into the deliberation room, individually called each juror into the courtroom, and asked each juror whether he or she could put what they had heard aside and fairly decide the case on the evidence. They all indicated they could. The circuit court denied Whitelow's mistrial motion.
¶27 When extraneous information is brought to the attention of the jury, "[t]he trial court must determine, in light of the whole proceeding, whether the [claimed error] is sufficiently prejudicial to warrant a new trial." State v. Bunch , 191 Wis. 2d 501, 506, 529 N.W.2d 923 (Ct. App. 1995). One permissible way for the court to determine whether the extraneous information prejudiced the jury is to individually question the jurors to ensure they can render an unbiased and honest verdict. See Oseman v. State , 32 Wis. 2d 523, 528, 145 N.W.2d 766 (1966). In determining potential prejudice, the court "consider[s] factors such as the nature of the extraneous information, the circumstances under which it was brought to the jury's attention, the nature and character of the state's case and the defense presented at trial, and the connection between the extraneous information and a material issue in the case." State v. Eison , 194 Wis. 2d 160, 179, 533 N.W.2d 738 (1995). A motion for a mistrial is addressed to the circuit court's sound discretion. Oseman , 32 Wis. 2d at 528.
¶28 The circuit court properly denied Whitelow's mistrial motion. It told the jury that any information provided by Juror N was inaccurate and instructed the jury that matters concerning a defendant's sentence are "exclusively before the Court" and must not influence the jury's verdict. The court considered the nature of the extraneous information and determined it was not so inherently prejudicial as to influence the jury's verdict. Though the risk for prejudice was low, the circuit court took care to further mitigate any potential prejudice by individually questioning each juror to ensure he or she did not consider the extraneous information and would remain fair and impartial. See State v. Messelt , 185 Wis. 2d 254, 270, 518 N.W.2d 232 (1994) ("[E]valuating a juror's sincerity is a task best left to the trial court's discretion."). Given the low potential for prejudice inherent in the nature of the information provided, as well as the circuit court's caution that the information was inaccurate and the steps taken to question each individual juror, the circuit court's decision was a proper exercise of discretion.[3]
The circuit court properly denied Whitelow's request for public funding for DNA testing.
¶29 WISCONSIN STAT . § 974.07 permits a convicted defendant to move for postconviction DNA testing. A court may grant such a motion only if the defendant satisfies a strict set of statutory criteria set forth in § 974.07(7)(a) or (b). State v. Denny , 2017 WI 17, ¶71, 373 Wis. 2d 390, 891 N.W.2d 144.
¶30 Whitelow moved for postconviction DNA testing of the tin foil and baggie pieces. At that time, under State v. Moran , 2005 WI 115, ¶3, 284 Wis. 2d 24, 700 N.W.2d 884, the circuit court could permit DNA testing at private expense even if the defendant did not satisfy the WIS. STAT . § 974.07(7) criteria. Determining that Whitelow had not met the heightened requirements of subsection (7), the circuit court denied his motion for testing at public expense, but granted his request to have the items tested at his own expense.
¶31 On appeal, Whitelow contends that the circuit court erred in denying his motion for testing at public expense. His argument is foreclosed by Denny , which overruled Moran by concluding that a defendant must satisfy the WIS. STAT . § 974.07(7) criteria to be entitled to any postconviction DNA testing, regardless of who bears the cost. Denny , 373 Wis. 2d 390, ¶¶ 71-73. The Denny court re-examined § 974.07 and concluded that the statute did not independently authorize DNA testing of evidence at private expense. Id. , ¶69.
¶32 Here, the circuit court correctly determined that Whitelow did not establish the applicability of the WIS. STAT . § 974.07(7)(a) or (b) criteria. Even if the bags contained a third party's DNA profile, those results would not create a reasonable probability of a more favorable outcome for Whitelow. See § 974.07(7)(b)1. Therefore, it is irrelevant whether Whitelow is indigent for purposes of § 974.07(12). If he is not entitled to testing, he cannot be entitled to testing at state expense.
By the Court. -Judgment and order affirmed.
This opinion will not be published. See WIS. STAT. RULE 809.23(1)(b)5.

All references to the Wisconsin Statutes are to the 2015-16 version unless otherwise noted.

The State initially charged Whitelow with two other counts that were dismissed before trial.

To the extent Whitelow is arguing that Juror N was biased, he fails to show anything erroneous about the circuit court's findings that she was forthright in answering the court's questions and could fairly decide the case.